Nelson H. SHAPIRO et al.

v.

GENERAL MOTORS CORPORATION
et al.

Civ. No. Y–71–1329.

United States District Court,
D. Maryland.

May 29, 1979.

Melvin J. Sykes, Baltimore, Md., and Robert H. Rines, Boston, Mass., for plaintiffs.

Paul V. Niemeyer and David F. Albright, Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

## I. THE FACTS

Plaintiffs Board and Shapiro spend their spare time as inventors of automotive seat belt equipment. Plaintiff Board is a practicing psychiatrist, and Shapiro an engineer and a patent attorney. In the mid-1960s, the federal government required the installation of seat belts in all new cars sold in the U.S. market. Plaintiffs Board and Shapiro held patents relating to an automatic seat belt retractor, a device which locks seat belts into place and prevents their slippage while being worn by a passenger. In order to realize a return on their investment in the patented articles, plaintiffs sought to license the articles directly with the nation's major car manufacturers. When they approached General Motors ("GM") in 1963, George Cook, the general director of pur-chasing, told plaintiffs that they had to talk with Hamill Manufacturing Company ("Hamill"), one of GM's suppliers of various automotive parts. According to Cook, GM did not deal directly with outside inventors, preferring instead to route them through suppliers. Plaintiffs also met with representatives from Chrysler and American Motors and with other suppliers of seat belt equipment, including Borg-Warner, American Safety Equipment Company ("American Safety"), and Irvin Industries.

The major car manufacturers told plaintiffs that to license their seat belt retractor device, they had to negotiate directly with the suppliers rather than with the manufacturers themselves. Consequently, plaintiffs commenced licensing negotiations in 1963 with American Safety and completed these negotiations in 1965. It was in conducting these negotiations beginning in 1963 that plaintiffs first became aware of defendants' policy of requiring royalty-free second source licenses. The practice of insisting upon royalty-free second source licenses is an attempt by the car manufacturers to guarantee a steady supply of particular parts used in their automotive production lines from multiple sources. In exchange for a supplier's receiving a certain share of a car manufacturer's business for a given input, the supplier must sign an agreement releasing the car manufacturer from having to pay any item-by-item royalties on the patented products made by the supplier. The obvious effect of such a policy, regardless of whether it is devised to guarantee a steady supply or for other reasons, is to reduce to zero the royalties which the inventors eventually receive. In other words, from a purely competitive standpoint, a licensee-supplier could not expect to remain in business very long if he agreed to pay royalties to inventors where his competitors did not agree, in effect, to cut their own profits by likewise paying royalties. In concluding a licensing agreement with Hamill in 1965, plaintiffs did agree to relinquish their right to 60% of the potential royalties.

American Safety constructed and tested manufacturing prototypes of plaintiffs' in-

ventions beginning in 1965, and plaintiffs received some $95,000, including a $25,000 down payment and minimum royalties under the licensing agreement. In 1966, however, American Safety cancelled the licensing agreement before plaintiffs' inventions were actually marketed.

Plaintiffs then renewed negotiations with Hamill in 1967 but were again confronted with a requirement for a royalty-free license provision for 50% of the procurement needs of the automobile manufacturers. No license agreement was ever concluded with Hamill.

In 1969 and 1970, plaintiffs again negotiated with Hamill to obtain licensing and to develop commercially plaintiffs' inventions. After several meetings, Hamill finally told plaintiffs that it would be economically unfeasible for them to pay plaintiffs' royalties, because Hamill would be operating at a competitive disadvantage vis-à-vis non-royalty-paying second source licensees designated by Ford and GM.

According to plaintiffs, similar negotiations with American Safety, Hamill, and Irvin Industries resulted in no licenses ever being consummated. In the case of negotiations with Irvin Industries, Irvin requested that plaintiffs agree to granting royalty-free licenses to car manufacturers for 90% of the manufacturers' procurement requirements for plaintiffs' inventions. This meant that plaintiffs would receive royalties on only 10% of their inventions. These license negotiations were also unsuccessful.

As plaintiffs conclude in their Memorandum arguing for summary judgment,

In every instance in which plaintiffs either licensed or attempted to license their inventions to a seat belt supplier of the defendants, plaintiffs were faced with a situation in which, because of the royalty-free, second-source licensing policies of the defendants, the prospect of paying reasonable royalties to plaintiffs was economically unattractive to the supplier.

Plaintiffs' Memorandum at 23.[1] On the basis of this alleged injury, plaintiffs filed a suit in this Court in 1971 against defendants GM and Ford. Contesting the legality of the royalty-free second source licensing policies, plaintiffs charged defendants with engaging in trade practices which restructured the entire industry relationship between inventors, licensee-suppliers, and the automakers. According to plaintiffs, the impact of defendants' policies not only tends to foster backward integration in the auto industry since suppliers must increasingly follow the dictates of the car manufacturers but also encourages a trend away from past practices whereby the auto industry relied heavily on various suppliers to discover inventions having new technology. Whereas at one time outside inventors were the principal sources of innovation in the automotive industry, plaintiffs contend that today any innovations come from in-house staff inventors, and the net result, aggravated by defendants' royalty policies, is to make it economically impossible for suppliers to deal with outside inventors.

Since the case was initially filed in 1971, discovery delays and numerous motions have produced seemingly unnecessary complications. While plaintiffs' theories as to patent-antitrust liability may, to some extent, be novel, the issues presented are not insurmountable. In its current posture, the case is before this Court on cross motions for partial summary judgment. Plaintiffs' complaint includes three counts: Count One alleges antitrust violations; Count Two, by reasserting the allegations of Count One, claims unfair competition; and Count Three states a claim for patent infringement. Only Counts One and Two are the subject matter of the partial summary judgment motions presented at this juncture. Claiming defendants' alleged infractions of the antitrust laws to be *per se* violations, plaintiffs seek both treble damages and an injunction against further violations.

---

1. References to "Plaintiffs' Memorandum" hereinafter refer to the Memorandum submitted in support of their motion for summary judgment, filed with this Court on June 15, 1978.

Plaintiffs have moved for summary judgment pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, stating that the material facts as pleaded are not in dispute. Defendants have responded but suggest that plaintiffs lack standing to pursue their claims and that plaintiffs' suit is barred by the applicable statute of limitations and the doctrine of laches.

## II. EVIDENCE OF CONSPIRACY

This case presents several fascinating issues of antitrust-patent litigation.[2] The essence of plaintiffs' complaint is that defendants' alleged policy of requiring royalty-free second source licensing, in effect, made "the prospect of paying reasonable royalties to plaintiffs . . . economically unattractive to the supplier." Plaintiffs' Memorandum at 23. While this result hurts the plaintiffs financially, they also seek to broaden this Court's conception of the real nature of the *social* harm involved by stating that the overall impact of defendants' licensing policy is to damage the "market for innovation" in the entire automobile industry:

> Simply stated, defendants have blocked the flow of technological improvements between plaintiffs and automobile buyers, thereby effectively restraining plaintiffs in their efforts to compete in the *market for innovation* in original automotive equipment.

Plaintiffs' Memorandum at 26 (emphasis added).

The complaint is artfully phrased, and reading through the various documents filed during the past seven years it becomes apparent that what is actually going on here is an attempt by plaintiffs to make some money on their invention. Both the discovery and their own admissions (see Plaintiffs' Memorandum at 20–23) indicate that they have a relatively weak record in terms of "paying" relationships with suppliers. Consequently, one might suppose that the language about the "market for innovation" is an effort by plaintiffs to temper their profitmaking motives with a general appeal to overall consumer welfare. It would seem, then, that given their theory of harm, plaintiffs have an obligation to explain how their failure to make a significant return on their investment as inventors resulted in an injury to the "market for innovation." What they appear to mean is that without a return for their efforts, they and others like them must give up inventing. As will be discussed in greater detail below, however, the antitrust laws do not automatically guarantee inventors returns for their activities.[3] Insofar as the consumer welfare issue is concerned, it would seem possible for the auto manufacturers to argue that not having to pay royalties might mean lower costs to consumers. If this is so, then plaintiffs should be able to explain how losing them as innovators is more valuable to consumers than paying lower car prices because of defendants' royalty-free licensing policy.

### A. Alleged Violations of Section 1 of the Sherman Act

Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

---

**2.** Article I, § 8, cl. 8 of the Constitution provides Congress with the authority to grant inventors exclusive rights to their discoveries for limited periods to promote new ideas and innovation. Pursuant to this constitutional grant, Congress passed the Patent Act, 35 U.S.C. §§ 1–293 (1976). *See* Note, *Patent Law— License Agreements*, 18 Vill.L.Rev. 968, 969–70 n.12 (1973).

**3.** While the primary objective of patent law is the public benefit, Rep. Att'y Gen. Nat'l Comm.

to Study Antitrust Laws 224 (1955), it remains generally true that ". . . whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these. * * *" (Footnote omitted). *Id.* citing *Kendall v. Winsor*, 21 How. 322, 327–29, 16 L.Ed. 165 (1859).

15 U.S.C. § 1 (1976). Plaintiffs claim that by combining with their suppliers to enforce their royalty-free license policies, defendants have created a *per se* violation of the antitrust laws. In paragraph 15 of their complaint, plaintiffs charge that defendants

> have attempted to and have conspired to monopolize and deliberately and by conscious parallelism have monopolized trade and commerce in the automotive industry in said equipment and apparatus by the policies and acts, among others, enumerated above, in violation of the anti-trust laws, including Section 2 of the Sherman Act.

Complaint at 7. In support of their claims, as advanced in their summary judgment motion, plaintiffs refer to a number of the most important antitrust conspiracy cases; however, in most of these instances, their reliance is misplaced since the conduct prohibited in those cases *clearly* involved conspiracy. As will be explained below, to this date there has been no colorable showing of a conspiracy in this case, and at this latest stage in the development of this case, plaintiffs' counsel admit as much.

Plaintiffs argue that "[w]here someone else acts in tandem with the malevolent actor, the parties to the combination may have different, and even conflicting goals, but there is still a combination." Plaintiffs' Memorandum at 26. Their reliance on *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), however, is misguided. *Parke, Davis* was a resale price maintenance case in which the Government had introduced evidence showing that Parke, Davis had actually announced a policy of refusing to deal with retailers who failed to charge the minimum prices required by Parke, Davis. Parke, Davis was active in setting up and maintaining this series of arrangements. As the Court noted, "Each wholesaler was interviewed individually but each was informed that his competitors were also being apprised of this. The wholesalers without exception indicated a willingness to go along." 362 U.S. at 33, 80 S.Ct. at 506. The Court noted a difference between "mere customer selection" and behavior which "created combinations or conspiracies to enforce resale price maintenance." 362 U.S. at 38, 80 S.Ct. at 508.

Given the previous reasoning in *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), it became evident that what was condemned in *Parke, Davis* was the particular method used to secure enforcement of the resale price maintenance scheme. The *Colgate* opinion has become celebrated on the basis of the following key passage:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

250 U.S. at 307, 39 S.Ct. at 468. Thus, under *Colgate* there was room for an agreement between the manufacturer and retailers to fix retail prices so long as their behavior fell short of becoming a conspiracy. *Parke, Davis* narrowed the *Colgate* privilege to the "mere announcement of . . . [the manufacturer's] policy [of not dealing with price cutters] and the simple refusal to deal." 362 U.S. at 44, 80 S.Ct. at 512. *See* R. Posner, Antitrust Law: An Economic Perspective 153–56 (1976).[4]

What happened in *Parke, Davis*, therefore, was the occurrence of activity which went beyond the limits set in *Colgate*:

---

4. Posner notes that some commentators believe that the implicit theory in *Parke, Davis* is that the combination between Parke, Davis and its wholesalers resembled a boycott, which is a *per se* violation of the Sherman Act. Posner questions this since resale price maintenance is also a *per se* violation. R. Posner, *supra*, at 155–56. *Colgate* has been traditionally criticized on the grounds that it weakens the *per se* prohibition against resale price maintenance first enunciated in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act. 362 U.S. at 44, 80 S.Ct. at 512. The Court held that in "involving the wholesalers to stop the flow of Parke, Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices," Parke, Davis stepped beyond the limitations permitted in *Colgate.* 362 U.S. at 45, 80 S.Ct. at 512. In seeking assurances of compliance as well as the compliance itself, 362 U.S. at 46, 80 S.Ct. 503, Parke, Davis was found to have organized a price-maintenance combination or conspiracy in violation of the Sherman Act. 362 U.S. at 47, 80 S.Ct. 503.

Plaintiffs' reliance on *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), is likewise misplaced. They characterize *Klor's* as holding that "concerted action to deprive even a single merchant of the goods he needed to compete effectively was a *per se* violation." Plaintiffs' Memorandum at 31. Although technically accurate, this assessment ignores the fact that *Klor's* involved a group boycott of proportions not alleged in the instant case:

Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer. This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendant's products.

359 U.S. at 212–13, 79 S.Ct. at 710. While it remains true that the Sherman Act "has consistently been read to forbid all contracts and combinations 'which "tend to create a monopoly," ' whether 'the tendency is a creeping one' or 'one that proceeds at full gallop,' *International Salt Co. v. United States,* 332 U.S. 392, 396 [, 68 S.Ct. 12, 92 L.Ed. 20]." 359 U.S. at 213–14, 79 S.Ct. at 710, as in *Parke, Davis,* the anticompetitive behavior condemned in *Klor's* had the characteristics of the type of public wrong proscribed by the Sherman Act.

The list of cases cited by plaintiffs includes some of the most noteworthy precedents in antitrust jurisprudence, yet in the case of virtually every alleged violation— market exclusion, blocking entry, and creating "bottlenecks"—plaintiffs' allegations describe defendants' behavior in purely conclusory terms so as to make defendants' behavior appear to fit within a given anticompetitive practice.

1. *Market exclusion.* On this point, plaintiffs cite *American Federation of Tobacco Growers, Inc. v. Neal,* 183 F.2d 869 (4th Cir. 1950), where the violation consisted of defendants allotting selling time on a tobacco auction market so as to exclude plaintiff, a tobacco farmers' cooperative, from the local market and effectively from competing against defendants, the Danville Tobacco Association. What the court condemned was the concerted behavior of "tobacco warehousemen who use their organization into a board of trade to monopolize the time of the tobacco buyers allotted to the market and thus to exclude another warehouseman from competing on the market with them." 183 F.2d at 873. *See also Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9th Cir. 1955) (contract requirements and agreements of exclusive dealing condemned).[5] While market exclusion may describe the impact of defendants' policies upon plaintiffs, there has been no evidence of the sort of "concerted behavior" prohibited in *American Federation.*

---

**5.** The *Karseal* court also reaffirmed the "target area" doctrine as to proximate cause in an antitrust injury:

the rule is that one who is only *incidentally* injured by a violation of the antitrust laws,— the bystander who was hit but not aimed at,—cannot recover against the violator.

*Loeb v. Eastman Kodak Co.,* 3 Cir. 1910, 183 F. 704; *Gerli v. Silk Ass'n of America,* D.C.S. D.N.Y.1929, 36 F.2d 959; *Corey v. Boston Ice Co.,* D.C.Mass.1913, 207 F. 465; *Conference of Studio Unions v. Loew's, Inc.,* supra (9 Cir., 1951, 193 F.2d 51). 221 F.2d at 363.

■ 2. *Blocking entry.* Plaintiffs adopt a "but for" argument (Plaintiffs' Memorandum at 23, 49 & 50) to the effect that they would have received royalties and, implicitly, licenses with suppliers, had defendants not engaged in illegal pricing activities. In *Parmelee Transportation Co. v. Keeshin,* 144 F.Supp. 480 (N.D.Ill.1956), *aff'd,* 292 F.2d 794 (7th Cir. 1961), plaintiffs argued that defendants *deliberately* closed to them competition in "an important field of interstate commerce," 144 F.Supp. at 484, and defendants claimed that by conspiracy or otherwise, the railroads might have awarded the terminal contract to a party other than plaintiffs. In refusing to dismiss the complaint, the court stated:

> It is beyond the power of the plaintiff, or anyone else, to say now with certainty what might or might not have happened had the conspiracy not intervened. Facts have been alleged from which it would be possible and reasonable to draw the inference that the contract would have been awarded to plaintiff but for the wrongful conduct of the defendants. This is sufficient.

144 F.Supp. at 485–86. Again, however, *Parmelee* involved significantly more "deliberate" behavior than the instant case. *See also United States v. General Dyestuff Corp.,* 57 F.Supp. 642 (S.D.N.Y.1940). While it is true that "[n]either the letter of the law nor its purpose 'distinguishes between strangling of commerce which has been born and preventing the birth of a commerce which does not exist,'" *United States v. United Shoe Machinery Co.,* 247 U.S. 32, 53, 38 S.Ct. 473, 480, 62 L.Ed. 968 (1918), it can be questioned whether plaintiffs accurately characterize themselves as being engaged in "commerce" in the traditional sense as that word is used in the antitrust laws. For example, does it even make sense to talk of excluding inventors from a market? Unless the inventor manufactures and sells his invention himself, it is not immediately clear how an inventor is being "excluded" from a market or even

from entering into commerce. While an inventor would undoubtedly have a financial interest in whatever royalties were generated once his invention were licensed and marketed, unless he manufactured the invention himself (which plaintiffs Board and Shapiro do not), it is doubtful that the inventor could allege that the "birth of a commerce" had been aborted.[6] As the court in *Raitport v. General Motors,* No. 73–2054 at 5 (E.D.Pa.1975), *aff'd,* 547 F.2d 1163 (3rd. Cir. 1976), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 248 (1977), said with respect to a similar claim to the effect that defendant car manufacturers were restraining new companies from entering the automotive components market, neither plaintiff nor any other automotive component "inventor-entrepreneur" has a federally guaranteed right to have his business proposals accepted and financed by private automotive companies. Moreover, the Supreme Court has long recognized the right of private companies, in the absence of any purpose to create or maintain a monopoly, to freely choose the parties with whom they will deal. *United States v. Colgate & Company,* 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

In *Gamco, Inc. v. Providence Fruit and Produce Building,* 194 F.2d 484 (1st Cir. 1952), the court noted that "[t]he [Sherman] Act does not merely guarantee the right to create markets; it also insures the right of entry to old ones." 194 F.2d at 487. Articulating the appropriate standard for assessing market exclusion, Judge Clark observed that "[t]he conjunction of power and motive to exclude with an exclusion not immediately and patently justified by reasonable business requirements establishes a prima facie case of the purpose to monopolize." 194 F.2d at 488. Yet in *Gamco,* the exclusion affected defendant's *competitors* directly, whereas to speak of the automakers and plaintiffs as direct competitors is to engage in an exaggeration.

---

**6.** This issue will be treated in considerable detail in the discussion of antitrust standing, *infra.*

On the other hand, plaintiffs and defendants may "compete" to the extent that defendants maintain in-house inventors. In the area of creative innovation, however, the traditional concepts of competition and market behavior seem misplaced. Although Ford and General Motors maintain their own in-house inventors, it seems unlikely that the automakers would rely on their own staffs entirely. New ideas in the automotive field can emerge from noncompany private "Edisons" as well as from company employees, and to the extent that the automakers utilize inventions from men like Board and Shapiro, they may in fact be able to pick and choose among new ideas until they discover what they want. Moreover, they can select from among private inventors' inventions without having to put these inventors on the company payroll. While the patent licensing system prevents companies from thereby getting a "free ride" from others' inventions, it is not at all clear as to whether the use of private inventions is cheaper, even with the royalties, than having in-house inventors.[7] Whether or not the use of private inventors is cheaper than in-house inventors, the use of the latter can be justified not on grounds of excluding people like Board and Shapiro, but rather because the automakers' in-house staff can concentrate on providing inventions which satisfy the automakers' technological requirements at a given time, whereas 100% reliance on private sources may prove detrimental to the industry (and the public) as a whole. Once a given product proves useful, like retractable seat belts, "backward integration" whereby the defendants would manufacture the input themselves may prove cheaper than dealing with a supplier. However, it is clear that backward integration does not follow automatically in all cases, otherwise Ford and GM would manufacture all of their own inputs, and "suppliers" as such would cease to exist. The thrust of this argument is towards one simple, pragmatic point: innovation, like creativity generally, is a fanciful, unpredictable gift, and plaintiffs' argument that defendants are trying to drive them out of or exclude them from the so-called market for innovation makes little sense. There would be no rational reason for defendants to exclude anyone from such a market because at any given time and for any patented input there is never any guarantee that in-house research and development will be better or cheaper or more successful than research and development supplied by private noncompany inventors. It cannot be seriously stated that defendants want to eliminate a source of potential benefit to themselves.

Plaintiffs cite *Gamco, supra,* for the view that

> a firm that controls a market must treat those within it evenhandedly. Where a firm gains value from innovation which it adopts for its own use, it must pay for that innovation. Certainly defendants pay their own in-house researchers. To refuse to pay outsiders for their innovation is to destroy those outsiders as competitors, in favor of the defendants' own in-house inventors.

Plaintiffs' Memorandum at 46. Plaintiffs are not being destroyed by defendants' refusal to pay them royalties. If anything, plaintiffs are either bad businessmen, poor negotiators, excessively profit-motivated, or all three. The patent laws protect their inventions, and they remain free to charge what they can get for their ideas. If they do not like the price, they simply do not have to sell. An aggrieved prospective purchaser will either do without the input or find available substitutes, possibly through "inventing around" the patent.

3. *Bottlenecks.* Related to plaintiffs' claim of market exclusion is their assertion that defendants control the market for in-

---

**7.** At issue here obviously is the difficulty in assessing both the costs of arriving at an invention and the means of providing an appropriate return on the investment undertaken. This problem is complicated whenever a vital product is discovered by accident or as a spinoff from research designed to produce something completely different. For an example involving "teflon" see W. S. Bowman, Jr., Patent and Antitrust Law: A Legal and Economic Appraisal 39 (1973).

novation, thereby constituting a "bottle-neck." Plaintiffs' Memorandum at 47. They elaborate upon this claim, explaining that the "theory provides that where a firm controls an essential stage of the production or distribution of a good and it competes at another level of production, it will be guilty of a Section 2 violation if it forecloses in any way access by its competitors to the essential stage." *Id.* at 47.[8] As authority, plaintiffs cite, inter alia, *Gamco* which is inapposite for the reasons discussed above, and *Packaged Programs, Inc. v. Westinghouse Broadcasting Co.,* 255 F.2d 708 (3d Cir. 1958), which is likewise poor authority to cite in connection with the evidence in this case. In *Packaged Programs,* the defendant *already* possessed a lawful telecasting monopoly and was using that monopoly power to create illegal monopolies elsewhere.

■ Lastly, reference should be made to plaintiffs' citation of *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 55 L.Ed. 619 (1911): "In applying the rule of reason, the touchstone is that the Sherman Act covers all conceivable conduct which could possibly come within its spirit or purpose." Plaintiffs' Memorandum at 42. *Standard Oil* is one of the most monumental of antitrust cases. According to this Court's reading of the case, plaintiffs' statement inverts what Justice White was really saying—for what he actually said was that because the Sherman Act was worded so broadly, it could cause "any act done by any of the enumerated methods anywhere in the whole field of human activity to be illegal if in restraint of trade." 221 U.S. at 60, 31 S.Ct. at 516. Because of this potential breadth of coverage, Justice White advocated a rule of reason approach for non-*per se* cases and called for the "exercise of judgment which required that some standard should be resorted to for the purpose of determining whether the prohibition contained in the statute had or had not in any given case been violated." 221 U.S. at 60, 31 S.Ct. at 516. Through *Standard Oil* and his opinion in *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911), Justice White gave content to the rule of reason approach to antitrust liability in a three-part form: (1) the "inherent nature" or *per se* concept of illegality; (2) the "inherent effect" or market power concept; and (3) the evident purpose or specific intent concept. *See* R. H. Bork, The Antitrust Paradox: A Policy At War With Itself 37 (1978). Among the major attributes of Justice White's opinion is that it showed concern "that the statute not interfere with means of creating efficiency or with market structures that resulted from efficiency." R. H. Bork, *supra,* at 34. Consequently, *Standard Oil* does not support an expansive application of the Sherman Act but rather suggests an application which, in non-*per se* cases, is sensitive to the preservation of economically efficient market structures wherever possible. Although plaintiffs have claimed a *per se* violation by defendants, they have failed to provide evidence of a conspiracy to violate the antitrust laws. The evidence presented thus far demonstrates that Ford and GM did insist upon the royalty-free second source licensing policy; however, the mere existence of the requirement does not automatically compel the conclusion that a conspiracy was presented or that the requirement otherwise violates the antitrust laws.

At the hearing on the cross motions for partial summary judgment, plaintiffs' counsel presented considerable evidence establishing that Ford and GM insisted that their suppliers agree to the royalty-free paid up license provisions.[9] Summarizing numerous

---

**8.** Section 2 of the Sherman Act reads as follows:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

**9.** The evidence consisted of portions of the depositions of various officials from Ford and GM, including Messrs. Desmarais, Cook, and Fisher

deposition statements, contract provisions and other documents discovered during the seven years since this case began, plaintiffs' counsel succeeded in showing that the royalty-free policies existed but not that there was any form of conspiracy between the automakers. At one point during the hearing, plaintiffs' counsel indicated that the record showed that Ford and GM purchase more than three-quarters of all seat belt equipment installed in American cars and between the two of them make three-quarters of all American cars. These observations were made to show that parallel policies exist resulting in independent inventors being prevented from dealing with the relevant market. Yet, when the Court further inquired as to whether there was any indication that this result was a mere happenstance or the consequence of an actual conspiracy, plaintiffs' counsel responded:

> We have no proof of conspiracy. We just say it is a very strange thing that the two giants—having some common suppliers of the same product and substantially the same equipment, and even as Mr. Cook says, sometimes possibly interchanging the use of tools, vice versa—that they should come up with all the same kind of requirements, those requirements being free licenses, ownership of tools. . . .

Transcript of Hearing on cross motions for summary judgment at 20 (Oct. 20, 1978).

■ Judging from this candid response as well as from the evidence presented thus far, the true nature of plaintiffs' substantive antitrust argument is not the existence of a conspiracy but the presence of consciously parallel behavior as manifested in the royalty-free second source licensing policy. Both parties have raised the issue of "conscious parallelism" in their memoranda. Conscious parallelism, also known as the "interdependence theory" of oligopoly pricing, refers to the situation alleged to result in markets where there are a few sellers

and where, though lacking an express agreement, the sellers appear to establish their prices in a "consciously parallel" fashion. *See generally,* R. Posner, Antitrust 115–27 (1974). Allegations of conscious parallelism have generally been considered in the light of Justice Clark's famous remarks in *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540–41, 74 S.Ct. 257, 259–260, 98 L.Ed. 273 (1954):

> The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement.
>
> \* \* \* \* \* \*
>
> But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but, "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely. \* \* \*

Justice Clark's approach to the conscious parallelism problem is still valid, although there have been recent signs that antitrust officials will begin prosecuting in the near future the first of a series of "shared monopoly" cases involving large companies in concentrated industries. *See, e. g.,* Ignatius, *Taking Aim at 'Shared Monopolies,'* Wall St.J., Aug. 22, 1978, at 18, col. 4. In light of the uncertain success which the Justice Department is likely to have as well as the absence of any departure from the traditional approach to conscious parallelism, for the purpose of this case, Justice Clark's reasoning is still valid.

---

who were intimately involved in or knowledgeable about the automakers' patent licensing policies, as well as licensing agreements, correspondence, and an internal Ford Supply Manual outlining the procedures for negotiation of license agreements. The highlighted portions of these documents demonstrate the existence of the policy but do not indicate the presence of a conspiracy.

### III. THE ECONOMICS OF PLAINTIFFS' POSITION

■ In light of the discussion as to the nature of the alleged harm complained of in this case and because the antitrust laws have as one of their primary goals the promotion of economic efficiency, *see* R. H. Bork, *supra,* at 91–92, it is instructive to examine several of the economic issues presented.

### A. Monopsony and Oligopsony

What is unusual about this case is that it appears to present an example of monopsony rather than monopoly, and this feature serves to complicate not only the legal analysis but the economic and policy aspects of the case as well. A monopoly is said to exist "if there is one, and only one, seller in a well-defined market." C. E. Ferguson, Microeconomic Theory 284 (1972). Given that neither Ford nor GM alone manages to account for more than half of the total U.S. automobile market, what we would ordinarily have, from a seller's perspective, is an oligopoly. Oligopoly exists "when more than one seller is in the market, but when the number is not so large as to render negligible the contribution of each." C. E. Ferguson, *supra,* at 334. In this case, however, plaintiffs are alleging that defendants' behavior as *purchasers* of inputs for their final products rather than their behavior as sellers to the public constitutes the gravamen in violation of the antitrust laws. "Where there is a single buyer of an input a *monopsony* is said to exist; if there are several buyers *oligopsony* is the proper designation." C. E. Ferguson, *supra,* at 436. It is generally true that since all firms in a given market producing the same product will need similar inputs, one typically finds oligopsony in the input market when there is a corresponding oligopoly in the seller's output market. K. Lancaster, Introduction to Modern Microeconomics 232 (1969). Ford and General Motors would fit this characterization given their large market shares in the U.S. car market. That it is this alleged monopoly in the input market (monopsony) which is the heart of plaintiffs'

complaint is apparent from the following passage in their memorandum:

> In the usual price-fixing case, the producer is accused of fixing the prices charged to its customers higher than would be charged under unrestrained conditions. In this case, Ford and GM fix the prices they *pay* the suppliers for innovation at a rate *lower* than would be set under unrestrained conditions. But since it is the buyers (the defendant automobile companies), rather than the sellers, who are exercising monopoly power in this case, it is not surprising that the price-fixing results in lower prices to the buyers, rather than higher prices to the sellers.

Plaintiffs' Memorandum at 40. In this passage, plaintiffs come very close to admitting that the royalty-free licensing policy means lower consumer prices. This result would follow in the event that the automakers passed on these savings directly to consumers. In light of this situation, plaintiffs bear a substantial burden in answering two crucial questions: (1) Can they show unambiguously that Ford and General Motors actually conspired to fix the prices at which they purchased their inputs? In other words, if there is no conspiracy or agreement to fix prices, were not the major car manufacturers behaving as rational economic decisionmakers in bargaining with their suppliers (plaintiffs' licensees) to secure the seat belt retractors at lower prices? and (2) Without evidence of a conspiracy, are not the plaintiffs simply presenting a case to the effect that they have been outbargained? Does not the royalty-free policy benefit consumers? Abandoning the royalty-free licensing policy would undoubtedly raise prices for defendants, and, just incidently, line plaintiffs' pockets.

■ Plaintiffs clearly want to extend the reasoning of *Parke, Davis, supra,* to the facts of this case. They argue, for example, that "GM forced its suppliers to negotiate *with each other* to shield GM from making payments for innovation. Each supplier knew that the policy applied to all suppliers, and acquiesced in the plan." Plaintiffs' Memorandum at 30. (Emphasis added).

Although plaintiffs are absolutely correct as to the impact of defendants' pricing policy, it does not follow necessarily that a negative impact upon plaintiffs is necessarily the type of behavior automatically proscribed by the antitrust laws. Similarly, plaintiffs argue that "[e]ven though the wholesalers were duped, the Court found that the use by one company of other companies to carry out its plan is a conspiracy within the meaning of Section 1 of the Sherman Act." Plaintiffs' Memorandum at 29. While this passage accurately characterizes the outcome in *Parke, Davis,* it is only relevant here to the extent that the Court finds facts evidencing a clear plan. In *Parke, Davis* there was considerable correspondence establishing the alleged conspiracy. There have been no such incriminating materials in this case.

Another difference from *Parke, Davis,* to be discussed in more detail below in connection with standing, is the element of indirectness which permeates this entire case. Many of plaintiffs' arguments sound as if they really should be made on behalf of the licensees who actually supply the seat belt apparatus to Ford and GM. Plaintiffs argue, for example, that

> By making it impossible for their seat belt suppliers to pay reasonable royalties to independent inventors for innovative

contributions to the original automotive equipment art, defendants have deprived plaintiffs of their livelihood from their trade and business of inventing and marketing inventions and have deprived the car-buying public of the benefits of plaintiffs' inventions.

Plaintiffs' Memorandum at 27. In a typical passing-on situation, one party is attempting to recover damages based on the fact that the antitrust violation occurred further upstream in the chain of dealing. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231, *reh. denied,* 393 U.S. 901, 89 S.Ct. 64, 21 L.Ed.2d 188 (1968). At issue then is the question of the remoteness of the alleged injury from the occurrence of the alleged violation. Usually in a passing-on situation, the injury results from higher prices being passed along the chain of distribution to consumers. In an oligopsony setting, however, plaintiffs would be arguing in effect that *lower* prices for inputs were being passed on and had an effect which was detrimental to their business. This situation might be termed a "pass-back" since the presence of oligopsonistic conditions means that lower prices (as plaintiffs argue) for the input prevent the plaintiffs from even getting a foot in the door of the relevant market.[10]

---

10. In their briefs, both sides have addressed the various issues raised in this case which are similar to those presented in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). *Illinois Brick* held that the pass-on theory, rejected as a proper defense in *Hanover Shoe, supra,* could not be asserted offensively by an indirect purchaser (plaintiff) against an alleged violator (defendant). 431 U.S. at 726, 97 S.Ct. 2061. In rejecting the offensive use of passing-on, the court noted that to do otherwise would be to run the risk of duplicative recoveries as well as to complicate the "evidentiary complexities and uncertainties" involved in proving an offense. 431 U.S. at 732, 97 S.Ct. 2061. With regard to the enforcement policies of the antitrust laws implicated by restricting recovery to direct purchasers only, the court said:

> [w]e understand *Hanover Shoe* as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing ev-

ery plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.

431 U.S. at 734, 97 S.Ct. at 2069.

On its face, although the court specifically stated that the outcome did not turn on the matter of standing, 431 U.S. at 728 n.7, 97 S.Ct. 2061, *Illinois Brick* appears relevant to the instant case, especially as a precedent for defendants. Plaintiffs would minimize its impact by referring to the possibility of Congressional modifications, while defendants cite it but without fully or precisely explaining its relevance. Here, what is being passed-on is lower prices rather than higher ones, and unlike the *Illinois Brick* situation, recovery would not be concentrated on the intermediate party (*i. e.,* the licensees) since that party has accepted the royalty-free policy. This Court notes the relevance of *Illinois Brick* in light of what may be called the "pass-back" present in this case. Since the presence of a patent context is vital to understanding the relevant antitrust policies to be applied in this oligopsony context, the value of

### B. Plaintiffs' Economic Analysis

At several points in their memorandum in support of their motion for summary judgment, plaintiffs advance a number of economic arguments of questionable validity. As these arguments touch substantially on the nature of the injury which plaintiffs alleged, as well as on their claim that they have standing, the Court will consider them briefly in light of the economic, legal, and policy issues which they raise.

1. *"It is a simple fact that the royalty-free license policies of the defendants have shifted from the inventor to the defendants the profit associated with inventing."* Plaintiffs' Memorandum at 37. While it is evident that plaintiffs are losing out here, it does not necessarily follow that defendants pocket the royalty. Although Ford and GM do not have to pay the royalty, it seems to be a meaningless distinction as to whether that money fills the coffers of the car manufacturers or rather permits them to charge less for their cars.

2. *"Faced with the unreasonable restraints of having to grant free licenses to competitors, a policy dictated by the defendants, the seat belt suppliers were hardly in a position to deal fairly and at arm's length with plaintiffs."* Plaintiffs' Memorandum at 36. The suppliers are not being hurt, apparently, so the reference to fairness and arm's length dealing is not entirely clear. As defendant GM points out in its Memorandum in support of its motion for summary judgment, at 22, it would appear that what plaintiffs are really complaining about is the price term—*i. e.,* that they are not receiving enough money in order to compensate them adequately for their investment.

■ 3. *"By requiring royalty-free licenses, the defendants effectively set the*

price of innovation under such licenses at zero." Plaintiffs' Memorandum at 39. Is it not the case that every inventor who fails to license or market his innovation or invention achieves a zero return insofar as his "price of innovation" is concerned? The antitrust laws do not guarantee inventors returns on their inventions. The patent laws do protect them against free riders for a period of seventeen years, allowing, in effect, a statutory monopoly, *United States v. E. I. DuPont de Nemours & Co.,* 118 F.Supp. 41 (D.Del.1953), aff'd, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1955); [11] however, there is no guarantee of financial success. *See generally,* W. S. Bowman, *supra* at 1–9.

4. *"Defendants' policies also have an indirect effect upon the price to be paid for inventions, and that effect has been declared unreasonable per se by the Supreme Court. The case of the United States v. General Motors Corp., 384 U.S. 127 [86 S.Ct. 1321, 16 L.Ed.2d 415] (1966), furnishes an example."* Plaintiffs' Memorandum at 39. The directness of the effect will be considered below as part of the standing analysis. One can read *General Motors,* however, to support a distinction similar to that offered above in connection with *Klor's* and *Parke, Davis* based upon substantially different facts being proved. In *General Motors,* the anticompetitive behavior involved was a classic conspiracy in restraint of trade involving joint, collaborative behavior by dealers, associations and GM to eliminate a group of competitors and to deprive franchised dealers of the freedom to deal with discounters. 384 U.S. at 138–48, 86 S.Ct. 1321. At issue was the restrictiveness of a particular "location clause" which GM attempted to enforce. Again, since the pattern of behavior here is admittedly differ-

*Illinois Brick* as a precedent must await further clarification by the Supreme Court. The standing tests considered *infra* are sufficient to dispose of the issues presented in this case, and the Court is mindful of the Supreme Court's distinction that "the question of which persons have been injured by an illegal overcharge [read "undercharge" here] for purposes of § 4 is analytically distinct from the question of

which persons have sustained injuries too remote to give them standing to sue for damages under § 4." 431 U.S. at 728, n.7, 97 S.Ct. at 2066, n.7.

11. The patent laws guarantee a patentee the right to "exclude others from making, using, or selling the invention throughout the United States." 35 U.S.C. § 154.

ent, plaintiffs' reliance on *General Motors* is necessarily undermined.

5. *"In this case, each defendant has total control over the decision as to what technology is embodied in its cars and each maintains research staffs in competition with outside inventors providing that technology. It is encumbent upon defendants not to use their strategic dominance to favor their in-house staffs."* Plaintiffs' Memorandum at 47. This assertion is totally without merit and amounts to stating that although defendants have invested substantial capital in creating their own in-house inventors, this house staff should not receive any special consideration and should be forced to compete against itself! In other words, plaintiffs want to compete against defendants' house inventors upon the condition that the latter do so with one hand tied behind their backs. The Supreme Court has already noted thirty years ago that

> The development of patents by separate corporations or by cooperating units of an industry through an organized research group is a well known phenomenon. However far advanced over the lone inventor's experimentation this method of seeking improvement in the practices of the arts and sciences may be, there can be no objection, on the score of illegality, either to the mere size of such a group or the thoroughness of its research.

*United States v. Line Material Co.,* 333 U.S. 287, 310, 68 S.Ct. 550, 562, 92 L.Ed. 701 (1948).

## IV. WHETHER PLAINTIFFS LACK STANDING

It is now clear that not every economic injury to a competitor will give rise to a colorable antitrust violation. In *Hawaii v. Standard Oil Company of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the Supreme Court stated that "[t]he lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust

violation." 405 U.S. at 263, n.14, 92 S.Ct. at 891–892, n.14. Furthermore, it should be remembered that the antitrust laws exist to protect competition and not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *See also* R. H. Bork, *supra,* at 58. By not receiving royalties for the use of their inventions, plaintiffs are undoubtedly denied the "profit" which they claim is the only incentive for innovation. But as one commentator has remarked:

> All investments are uncertain, all involve risks, and all would be increased if they were made more remunerative. A rational patent system should be able to identify the unique attributes of investment in ideas which qualify them for special treatment as opposed to investment in alternatives.

W. S. Bowman, *supra,* at 18. Without opining as to whether the patent system generally undercompensates or overcompensates innovation, it will suffice to observe that seeking patent reward is inextricably connected with the economy's profit system and necessarily involves uncertainty, "uninsurable risks," and what has been called a "moral hazard." *See* W. S. Bowman, *supra,* at 28. Damages in patent litigation will necessarily influence not only the cost of engaging in innovative activity but likewise the costs incurred by society either in purchasing the fruits of that activity or in being deprived of access to such fruits. One commentator has observed, that "[t]he law lets the marketplace determine the value of a new invention and protects the right of the patent owner to receive this value as his reward for his technological advance." J. G. Van Cise, Understanding The Antitrust Laws 187 (1973 ed.).

A. *Generally.* Section 4 of the Clayton Act, 15 U.S.C. § 15, reads as follows:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may

sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit including a reasonable attorney's fee.

Taken literally, this language could provide relief to all persons whose injuries were in the least amount causally related to an antitrust violation. The courts, however, have refused to adopt such a broad approach. *See, e.g., Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir. 1910) (limiting standing under section 7 of the Sherman Act, predecessor of section 4 of the Clayton Act). *Cf. Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,* 245 U.S. 531, 534, 38 S.Ct. 186, 62 L.Ed. 451 (1918). *See also* L. Green, The Rationale of Proximate Cause 122–23, 195–97 (1927); Polock, *The "Injury" and "Causation" Elements of a Treble-Damage Antitrust Action,* 57 Nw.U.L.Rev. 691, 697–700 (1963). As the Ninth Circuit Court of Appeals has commented:

> a measured approach has prevailed; courts have impressed a standing doctrine so as to confine the availability of section 4 relief only to those individuals whose protection is the fundamental purpose of the antitrust laws. *Cf. Barlow v. Collins,*

397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Mount Clemens Industries, Inc. v. Bell,* 464 F.2d 339, 341–44 (9th Cir. 1972). Unfortunately, no "bright line" has yet emerged to divine this group, and courts have formulated varied definitions.

*In re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d 122, 125 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). The key language in Section 4 has been the phrases "business or property" and "by reason of," which provide the twin requirements for standing. First, a plaintiff must allege an injury to his "business or property" in a strictly commercial sense. *See Hawaii, supra,* 405 U.S. at 264, 92 S.Ct. 885 (the words "business or property" refer to commercial interests or enterprises). Second, a plaintiff must allege that his injury resulted "by reason of" an antitrust violation. *Hawaii, supra,* 405 U.S. at 263–64, n.14, 92 S.Ct. 885. In approaching these requirements analytically, courts have tended to adopt one of two methods of analysis: the "direct injury" and the "target area" approaches.[12] *See generally* L. Sullivan, Antitrust § 227 (1977); A. Stickels, Federal Control of Business: Antitrust Laws § 187 (1972); Sher-

---

**12.** The *In re Multidistrict* court provided a summary as to how the various circuits had approached this analysis:

> We do not mean to imply that each circuit falls neatly into one of the two pigeonholes. Only the Eighth Circuit and ours, for example, have consistently followed the "target area" approach, *e.g., Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970); *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.,* 368 F.2d 679, 688–689 (8th Cir. 1966) (Blackmun, J.), and even they have diverged occasionally. *E.g., Perkins v. Standard Oil Co., supra,* note 6 [396 F.2d 809 (9th Cir. 1968)]. The First, Third, Sixth and Tenth Circuits on the other hand, generally apply the test we label "direct injury." *E.g., Reibert v. Atlantic Richfield Co.,* 471 F.2d 727 (10th Cir. 1973); *Kauffman v. Dreyfus Fund,* 434 F.2d 727, 732–734 (3d Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 394–395 (6th Cir. 1962); *Miley v. John Hancock*

*Mut. Life Ins. Co.,* 148 F.Supp. 299 (D.Mass.), aff'd *per curiam,* 242 F.2d 758 (1st Cir.), cert. denied, 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957). The Second, Fourth and Fifth Circuits have formulated their own particular mixtures of the two tests, *e.g., Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971); *Dailey v. Quality School Plan, Inc.,* 380 F.2d 484 (5th Cir. 1967); *South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414 (4th Cir. 1966), although the approach of the Second more closely resembles the "direct injury" test and that of the Fourth and Fifth, the test of "target area". The Seventh Circuit's approach is uncertain, although it appears closer to "target area". *Compare Sandidge v. Rogers,* 256 F.2d 269 (7th Cir. 1958) *with Congress Building Corp. v. Loew's, Inc.,* 246 F.2d 587 (7th Cir. 1957). In ascribing positions to the various circuits, we have ignored self-descriptions and have attempted to analyze their actual approaches. 481 F.2d at 127, n.7.

man, *Antitrust Standing: From Loeb to Malamud,* 51 N.Y.U.L.Rev. 374 (1976); Lytle & Purdue, *Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation,* 25 Am.U.L.Rev. 795 (1976). One court has even adopted the "zone of interests" standing test to be considered in more detail *infra. Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142 (6th Cir. 1975).

**B.** *The Direct Injury and Target Area Tests*

 The direct injury test looks primarily at the relationship between plaintiff and the alleged antitrust violator. This test has spawned concern over whether an injury is the direct, indirect, consequential or remote result of the alleged violator's behavior and has been most recently treated from the perspective of "passing-on" in the *Illinois Brick* decision, *supra.* Under the target area test, a court will look at the effect of the alleged violator's activities within a particular area of the economy in which plaintiff claims to have been harmed:

> [T]o state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured "by reason" of anything forbidden in the anti-trust laws.

*Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51, 54–55 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). It is obvious that the elements of proof required will vary depending on which test is applied. The direct injury test raises the issue as to whether consumers have standing to use the passing-on argu-

ment offensively, while the target area test presents complications in both identifying real targets and particular areas of the economy which are affected.

In *Perkins v. Standard Oil Co. of California,* 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), *reh. denied,* 396 U.S. 871, 90 S.Ct. 36, 24 L.Ed.2d 126 (1969), the Supreme Court considered whether "fourth level" price discrimination was forbidden under Section 2 of the Clayton Act, as amended by Section 13 of the Robinson-Patman Act, 15 U.S.C. § 13. The Supreme Court reversed the Ninth Circuit which had decided the question in the negative, noting that the direct-indirect "limitation is wholly an artificial one and is completely unwarranted by the language or purpose of the Act." 395 U.S. at 647, 89 S.Ct. at 1874. The Ninth Circuit has read this opinion (although not speaking directly to Section 4 of the Clayton Act) as constituting direct support for use of the target area test instead of the direct injury test. In *In re Multidistrict, supra,* it said:

> To attain standing, a plaintiff must thus allege that the anti-trust violation injured a commercial enterprise of the plaintiff in the area of the economy in which the elimination of competition occurred. Standing is denied, on the other hand, if the claimant's commercial activity occurred outside that area of the economy.

481 F.2d at 128.[13] Referring to the target area approach as being "logical and flexible," 481 F.2d at 128, the court, reversing in part the district court, held that crop farmers did not have standing to allege that auto manufacturers had conspired

(a) To eliminate all competition among the automobile manufacturers in the research, development, manufacture and installation of motor vehicle air pollution equipment;

---

13. The Court also considered standing under § 16 of the Clayton Act:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a viola-

tion of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . .

15 U.S.C. § 26.

(b) To eliminate competition . . . in the purchase of patents and patent rights from other parties covering motor vehicle air pollution equipment.

481 F.2d at 129. In denying standing under Section 4, the court noted that:

*Perkins* therefore clarifies any ambiguity inhering in *Hawaii's* failure to adopt expressly either of the two predominant judicial glosses on the language "by reason of". By repudiating all those aspects of the "direct injury" test that distinguish it from the "target area" approach, and by embracing and applying the latter, the Court in *Perkins,* at least inferentially, impresses its imprimatur upon the "target area" approach articulated by this court: a plaintiff has standing under section 4 of the Clayton Act if the claimed losses fall "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *E.g., Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970); *Hoopes v. Union Oil Co.,* 374 F.2d 480, 485 (9th Cir. 1967); *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9th Cir. 1955); *Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). A proper application of "by reason of" focuses on whether the anti-competitive conduct directed against an area of the economy injured business operations conducted by the claimant in that sector of the economy. The resulting two-step approach first requires identification of the affected area of the economy and then the ascertainment of whether the claimed injury occurred within that area.

481 F.2d at 129. Although plaintiffs were denied standing under the target area test, the Ninth Circuit threw in a footnote which spoke to certain other possible plaintiffs:

Examples of plaintiffs falling within one or more of these markets, as appellants concede, include an alleged inventor and a manufacturer of motor vehicle air pollution control equipment who claim losses from asserted inability to market their devices.

481 F.2d at 129, n.10.

Plaintiffs Board and Shapiro rely on *In re Multidistrict* as "clear precedent for [their having] standing in this case." Plaintiffs' Reply Memorandum at 17. They assert that the words "seat belt" can be substituted for "air pollution" in the above-quoted passage (481 F.2d at 129, n.10), placing plaintiffs clearly within the target area. Furthermore, plaintiffs cite the fact that in *In re Multidistrict,* even the crop farmers were found to have standing to seek equitable protection under Section 16 of the Clayton Act. 481 F.2d at 131. On its face, *In re Multidistrict* is a good precedent for plaintiffs to cite—especially in light of the dictum in footnote 10; however, the case is of limited value because, on its facts, it did not analyze in detailed fashion the specific concerns of the antitrust-patent law interface, an interface which of necessity impacts upon traditional notions of antitrust standing in the present case.

The Fourth Circuit's only decided case on antitrust standing is *South Carolina Council of Milk Producers v. Newton,* 360 F.2d 414, 418, 419 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). There, the court held that where raw milk producers incurred depressed profits as a result of retailers combining to sell milk as "loss leaders," plaintiffs had incurred an injury sufficient to allow them standing to sue. The court found plaintiffs to belong to the appropriate target area which was defined as follows:

If a plaintiff can show himself within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby, then he has standing to sue under section 4.

360 F.2d at 418. Stressing both foreseeability and causation, the court applied the test in the following manner:

The pivot of decision presently is whether the defendants' asserted conduct was the proximate cause of the plaintiffs' asserted injury. If the damage was

merely incidental or consequential, or if the defendants' antitrust acts are so removed from the injury as to be only remotely causative, the plaintiffs have not been injured "by reason of anything forbidden in the antitrust laws" as contemplated by the Clayton Act.

360 F.2d at 419. While the court found that the combination harmed the dairy industry as a whole, the absence of privity among the parties was not a material factor. As appears obvious from the above-quoted material, the Fourth Circuit's approach to the target area question has been to consider also the nature of the damage done. But in using words like "incidental" and "consequential," the court shows a willingness to consider not only the definition of an area and a party's position within that area, but also the qualitative nature of that harm as well.[14] Such an approach is consistent with the reasoning in *Hawaii, supra,* that not every injury traceable to an antitrust violation must result in damages. 405 U.S. 251, 263, n.14, 92 S.Ct. 885, 31 L.Ed.2d 184. *See Stern v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries,* 367 F.Supp. 536 (D.C.D.C. 1973). Furthermore, it is clear that in assessing the nature of the harm in light of the intent of the antitrust laws to provide protection and remedies against certain activities:

> [E]ach case . . . must be carefully analyzed in terms of the particular factual matrix presented. In making this factual determination courts must look to, among other factors, the nature of the industry in which the alleged antitrust violation exists, the relationship of the plaintiff to the alleged violator, and the alleged effect of the antitrust violation upon the plaintiff. Then, while recognizing that breaches of the antitrust laws

have effects throughout society, a court must decide whether this plaintiff is one "whose protection is the fundamental purpose of the antitrust laws."

*Cromar Co. v. Nuclear Materials & Equip. Corp.,* 543 F.2d 501, 506 (3d Cir. 1976). See also the conclusion that the elaboration of the "factual matrix" as proposed in *Cromar* "recognizes that § 4 standing analysis is essentially a balancing test comprised of many constant and variable factors and that there is no talismanic test capable of resolving all § 4 standing problems." *Bravman v. Bassett Furniture Industries, Inc.,* 552 F.2d 90, 99 (3d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977). *See Robbins Flooring, Inc. v. Federal Floors, Inc.,* 445 F.Supp. 4, 11 (E.D.Pa.1977).

In assessing standing from the perspective of litigation involving a proposed patent licensing arrangement, the issues such as target, directness, and even injury become less tangible and more susceptible to what the philosophers call counter-factual reasoning, *i. e.,* "But for X's activities, I would have licensed my patent and become rich." In this patent case, the "but for" element plays a substantial role, since plaintiffs are alleging that but for defendants' royalty-free second source licensing policy, they would have struck a deal with one or more of defendants' suppliers and received the appropriate royalties.

*Pastor v. American Telephone & Telegraph Co.,* 76 F.Supp. 781 (S.D.N.Y. 1940), is a case similar in many respects to the instant one. Plaintiff alleged that defendant exercised its power over the telephone industry so as to "influence and control the character and specification of apparatus constituting or used in conjunction with subscribers' stations, and of any apparatus to be connected thereto." 76 F.Supp.

14. The Fifth Circuit has developed a two-step approach for focusing on the affected area of the economy. *Yoder Bros. v. California-Florida Plant Corp.,* 537 F.2d 1347 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). *See also Hardwick v. Nu-Way Oil Co.,* 443 F.Supp. 940, 944 (S.D.Tex.1978):

First, the affected area of the economy must be identified. Second, the court must determine whether the claimed injury occurred within that area. *Yoder Bros. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1360 (5th Cir. 1976) (citing *In Re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d 122, 129 (9th Cir. 1973), *cert. denied Morgan v. Automobile Mfgrs. Ass'n,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336).

at 782. Plaintiff was a patent owner of an automatic repertory dial device to be attached to a dial telephone:

> The amended complaint alleges that the defendant is engaged in the telephone business, operating toll telephone lines which carry upwards of 80% of the long distance telephone traffic in the United States and that the defendant controls a group of corporations engaged in the telephone business and auxiliary fields known as the Bell System.

76 F.Supp. at 782. Plaintiff alleged that defendant's policies had "restrained" his sale of devices to the potential market and had prevented him from marketing the product. In granting summary judgment for the defendant, the court noted that the testimony showed that plaintiff never made any applications to defendant for installation of the device, and, moreover, none of the devices were even manufactured. The court phrased the relevant question as follows:

> Did the refusal of the defendant to buy plaintiff's patent or ask for a license to manufacture devices under his patent, and its failure to make available to the public a similar device constitute a restraint of trade? Counsel for the plaintiff freely acknowledges that the mere refusal of the defendant to deal with the plaintiff does not constitute a violation of the Anti-Trust Laws, but claims that the policy against foreign attachments has resulted in a restraint of trade to the plaintiff's damage. The argument of counsel seems to be that this policy is against the spirit of the Anti-Trust Laws, but there is a failure to show or in fact to allege any specific violation of a prohibition contained in the Sherman and Clayton Anti-Trust Acts. In the absence of any such showing, plaintiff has no cause of action thereunder. *LaChappelle v.*

*United Shoe Machinery Corporation,* D.C., 13 F.Supp. 939.

76 F.Supp. at 784. When plaintiffs Shapiro and Board approached defendants in connection with licensing their patents, they were told to see the defendants' suppliers. This action alone cannot amount to an antitrust violation since defendants had no obligation to serve as licensees. From the pleadings, therefore, there has been no allegation that plaintiffs here, as in *Pastor,* manufactured the devices themselves, were in a position to do so, or found any promoter willing to do so. Presumably, the failure to find a promoter can be characterized in either of two fashions: (1) Ford and GM would not change their policies so as to grant royalties, or (2) plaintiffs would not accept less money for their invention.

The court in *Productive Inventions, Inc. v. Trico Products Corp.,* 224 F.2d 678 (2d Cir. 1955), considered the following question:

> Is a patentee who has granted to another an exclusive license for the term of the patent, upon a royalty basis a "person * * * injured in his business or property" (within the meaning of Section 4 of the Clayton Act) so as to enable him to recover treble damages for loss of royalties on sales that might have been made by its licensee save for the antitrust violations of defendant?

224 F.2d at 679. Holding that he was not, the court stated that

> Those harmed only incidentally by antitrust violations have no standing to sue for treble damages; only those at whom the violation is directly aimed, or who have been directly harmed, may recover.

224 F.2d at 679.[15] Although plaintiffs claim that defendants' actions were "directly aimed at" them , there is no clear evidence on this matter. The *Trico* court concluded by remarking that

---

**15.** The court cited approvingly the following passage from the Ninth Circuit's opinion in *Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51, 55 (9th Cir. 1951):

> Such a construction is in accordance with the basic and underlying purposes of the anti-trust laws to preserve competition and

to protect the consumer. Recovery and damages under the anti-trust law is available to those who have been directly injured by the lessening of competition and withheld from those who seek the windfall of treble damages because of incidental harm.

any financial loss suffered by the plaintiff was only incidental to the acts complained of. Here, too, the appellant has no standing under the anti-trust laws to complain of the incidental loss of royalties by activities of Trico, not directed at it.

224 F.2d at 680.

*SCM Corp. v. Radio Corporation of America,* 407 F.2d 166 (2d Cir.), *cert. denied,* 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461, *reh. denied,* 396 U.S. 869, 90 S.Ct. 38, 24 L.Ed.2d 125 (1969), was another case involving the deprivation of royalties. RCA claimed that because of certain activities of SCM, RCA was:

"... immediately injured * * *, in that RCA has been wilfully and maliciously deprived of royalties lawfully due * * * [under Patent '539] and has been put to the burden and expense of defending this law suit." Injunctive relief is sought on the theory that RCA has been prevented from enjoying the full benefits of its patents and, in effect, would have prospered "but for" SCM's acts.

RCA contends that SCM's monopolization "if successful" will deprive it of the fruits of licensing, that "even if SCM must pay some royalty, if it is the only available licensee," SCM might insist on a smaller royalty, that "if that event comes to pass, RCA would be 'directly' injured"; and that RCA seeks only to avoid threatened loss "if the threat materializes" (RCA reply brief).

407 F.2d at 170. The court found that RCA had not alleged any injury sufficient to give it standing to sue, and furthermore, that its loss of royalties was not an injury sustained because of the plaintiff's antitrust violations. *Id.*

The holding in *Midway Enterprises, Inc. v. Petroleum Marketing Corp.,* 375 F.Supp. 1339 (D.Md.1974), would appear to provide support for plaintiffs' standing arguments. The case is valuable in providing a nutshell summary of traditional standing doctrines, but, it is distinguishable in light of the particular patent context of the instant case. The plaintiff in *Midway* sought damages and injunctive relief for alleged wholesale price fixing. The complaint charged defendant and other suppliers of independent service stations of conspiring to raise, fix, maintain, and stabilize the wholesale prices of gasoline in Maryland, Virginia, and the District of Columbia. As a result of defendant's alleged activities, plaintiff claimed it was required to purchase gasoline at excessive prices, and as a direct consequence, suffered losses which led to the destruction of its business. Defendant's motion to dismiss for lack of standing was denied.

In the opinion, the court recognized that "[t]he standing requirement is not satisfied merely by proof that some adverse effect on the plaintiff can be traced to the defendant's unlawful activity." 375 F.Supp. at 1341. Noting that the direct injury test in *Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir. 1910), had been construed to require the plaintiff to "have direct relations (be in privity of contract) with the defendant," 375 F.Supp. at 1341, the opinion reviewed a number of cases denying standing and concluded that "[i]n each of these cases, the plaintiff was not the party which suffered the immediate injury but whose loss resulted from his relationship with another entity." *Id.* After explaining the reasons behind the Fourth Circuit's adoption of the "target area test" proposed in *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9th Cir. 1955), it concluded that, as opposed to the exaltation of form over substance in the direct injury test, the target area test, by focusing on the plaintiff's relationship to the area of the economy allegedly injured by the defendant, "provides a far more logical and flexible tool to analyze the standing question," 375 F.Supp. at 1344:

Standing is denied, however, if the plaintiff's business activity occurs outside that area of the economy. *See In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, supra.* The advantage of the "target area" theory, then, is that it examines the circumstances surrounding the purported violation and prevents a defendant from

avoiding the sanctions of the antitrust laws by the simple expedient of interposing entities between himself and the plaintiff.

With respect to the facts presented in *Midway*, the opinion concluded that

the primary effect of defendant's alleged practices was on the gasoline sold by plaintiff and other independent service stations, which was competitive with that sold by defendant. The ultimate effect was to eliminate the competitive position of the plaintiff and other independents.

375 F.Supp. at 1344.

Plaintiffs have relied on this case in their opposition to defendants' standing arguments. They have argued that since defendants' suppliers were not harmed by the royalty-free second source licensing policy, the full impact of defendants' pricing policies falls upon them. Rather than approach the question from a direct-indirect labeling perspective, plaintiffs actually do rely on the target area standard claiming that they are the *only* target since the suppliers are left unharmed. Conceivably, plaintiffs could argue that unlike *Trico, supra,* and the other cases subsequent to *Loeb, supra,* which developed the direct injury test, they suffered the immediate and direct injury due to defendants' pricing policy.

Under a target area test, however, the directness or indirectness of the injury would be of no consequence; the mere fact of the injury and that the victim was a target would appear to suffice. One could, however, suggest that the target area test itself begs the direct-indirect injury question since one would have to come to grips with what *sort* of entity could, under the circumstances, constitute a target. Query, for example, as to whether a target amounts to nothing more than an "entity 'directly' aimed at" since presumably targets are not indirectly aimed at with any degree of success. The vitality of the target area test in its pristine form may be showing signs of being undermined. See, for example, the holding in *L & H Investments, Ltd. v. Belvey Corp.,* 444 F.Supp. 1321 (W.D.N.C.1978), where the court said:

After [*NBO Industries Treadway Cos., Inc. v.*] *Brunswick* [*Corp.,* 523 F.2d 262, 273 (3d Cir. 1975)] it is apparently not enough that plaintiff stand somewhere in the threatened sector of the economy; he must also show that his injury is logically related to the violation. The emphasis is shifted from proximate causation to an analysis of the *type* of antitrust violation alleged and the anticompetitive effects it is thought likely to produce.

444 F.Supp. at 1324 (emphasis in original). Presumably this variation of the standard target area test may indicate that merely alleging injury in fact will be insufficient in the future. For a critical analysis of standing which recognizes the inconsistencies and confusion in the direct injury and target area tests, see Berger & Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale L.J. 809, 830, 843 (1977) ("in practice most courts treat the target area as a test for directness of injury").

A further problem with the target area test is that by its language, a plaintiff must show that "he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Conference of Studio Unions v. Loew's Inc.,* 193 F.2d 51, 54–55 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). In the present case, it is unclear whether this test can be applied with any significant meaning. What does it mean, for example, for plaintiffs to show that they are in an area of the economy "endangered by a breakdown of competitive conditions" when they are patentees possessing a statutory monopoly in the first place? They are, by law, placed in the position of being monopolists who are capable of negotiating with oligopolists such as Ford or GM (or their suppliers) to obtain the best price for their inventions. The whole concept of fully competitive conditions must be modified in the patent context where it would seem that if a patentee has something of real value, by virtue of his monopoly, he is automatically placed in a better bargaining position from which to exploit his product. The overall result is

one in which "the law lets the marketplace determine the value of a new invention." J. G. Van Cise, *supra.*

## C. A New Standard

In *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir. 1975), the court found that the investment companies' allegation that the failure of a supplier to provide the needed financing for a service station effectively foreclosed their ability to expand their operations was a sufficient allegation of injury to entitle plaintiff to standing. Following the language used by the Supreme Court in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the court held that the test for standing to sue in a private antitrust action is whether the plaintiff has alleged that the defendant caused him injury in fact and that the interest sought to be protected by the plaintiff is arguably within the zone of interests protected by the antitrust laws. 521 F.2d at 1151. While the case provides a useful summary of previous standing doctrines, its reliance on *Data Processing* is surprising since no other case in the intervening five years had even raised the possibility of a zone of interests test outside of the administrative context in which *Data Processing* arose. *See, e. g.*, Sherman, *Antitrust Standing: From Loeb to Malamud*, 51 N.Y.U.L.Rev. 374, 378 (1976).

The *Malamud* court first explored standing as part of the general concept of justiciability, *i. e.*, as a means of controlling access to the federal courts. To meet these requirements, there must be a showing of injury in fact in order to satisfy the Constitution's case or controversy provision. U.S. Const. art. III, § 2. Additionally, standing allowed the courts some leeway in determining whether a given plaintiff is "the proper litigant in a suit." 521 F.2d at 1147. To accomplish this, the court should assess " 'the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.' " *Id., citing Flast v. Cohen*, 392 U.S. 83, 89, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). On these grounds, however, the court rejected the current approaches to standing as being inadequate. Expressing dissatisfaction with the traditional standing doctrine, the opinion stated:

> As we see it . . . by using either approach a court is enabled to make a determination on the *merits* of a *claim* under the guise of assessing the *standing* of the *claimant.* Under either theory the entire question of directness is one that must be resolved upon some factual showing, but standing is a preliminary determination ordinarily to be evaluated upon the allegations of the complaint.
>
> . . .

*Id.* at 1150 (emphasis in original) (footnote omitted).

The Sixth Circuit's promulgation of the zone of interests test in *Malamud* has been criticized on a number of grounds. *See generally*, Sherman, *supra*, and Lytle & Purdue, *Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation*, 25 Am.U.L.Rev. 795 (1976). First, the zone of interests standard articulated in *Data Processing* must be confined to its original context, namely, that of administrative standing. The test was not intended by the Supreme Court to apply across the board to all standing issues, and Sherman has referred to its use by the *Malamud* court as an "unwarranted excursion into the law of administrative standing." 51 N.Y.U.L.Rev. at 405. Administrative cases, unlike most private antitrust litigation, rarely seek damages, hoping instead to obtain injunctive relief. This likelihood of damages—automatically trebled in the antitrust context, 15 U.S.C. § 15—presents the substantial possibility of "overkill", *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972), especially when the maintenance of private antitrust actions brought by "private attorneys general" allegedly acting in the public interest poses the increased likelihood of windfall recoveries. To quote Sherman:

By equating administrative standing with antitrust standing, the *Malamud* court thus failed to heed Professor Scott's sound advice that "to understand the functions of the doctrine, it is necessary at the outset to distinguish the different contexts in which an issue of standing is said to arise." (*Citing* Scott, *Standing in the Supreme Court—A Functional Analysis*, 86 Harv.L.Rev. 645, 646 (1973)).

51 N.Y.U.L.Rev. at 378. Focusing on the economic and policy differences presented in the present case distinguishes it from *Midway, supra*, and supports a denial of standing. Moreover, even under a zone of interests test, it is by no means certain that plaintiffs would have standing, since the test explicitly invited consideration of the interests at stake in light of the particular statutory or constitutional guarantee being invoked. 397 U.S. at 153, 90 S.Ct. 827.

The Supreme Court has recently observed that "[a]lthough standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . it often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The *Malamud* court ignored considerations such as these. Given the possibility of treble damages should the plaintiff prevail, one can readily understand that even from the outset, the *in terrorem* effect of an antitrust complaint has a settlement value to the plaintiff "out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment." [16] 421 U.S. at 740, 95 S.Ct. at 1927.

## D. The Standing Tests and This Case

■ Any final determination as to standing will necessarily turn on the question of the remoteness of the alleged injury, *i. e.*, the relationship between the alleged antitrust violation and the injury inflicted on plaintiffs. Such a determination must consider not only the policies behind allowing recovery under the antitrust laws but also the complicated interrelationships which arise when antitrust and patent law are presented in the same claim. Plaintiffs have the burden of showing (1) that an antitrust violation occurred, and (2) that they were within the "target area" of the anticompetitive activity. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *Long Island Lighting Co. v. Standard Oil Co. of California*, 521 F.2d 1269, 1274 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976) ("even parties whose injuries may be both immediate and foreseeable may lack standing to pursue a private remedy if that injury is indirect or incidental, or if their business was not in the target area of the allegedly illegal acts.") It will be recalled that in terms of substantive violations of the antitrust laws, those found in *Parke, Davis* and *Klor's* were substantially less "incidental" than those alleged by plaintiffs here.

■ The alleged antitrust violation must yield an injury which is "direct" and not "incidental." *See SCM, supra; Flood v. Kuhn*, 312 F.Supp. 404 (S.D.N.Y.1970). The specifics of the "target area" test have been refined and amplified as a result of the opinion in *Calderone, supra*. That case specifically concerned standing under Section 4

---

**16.** The quotation is from Mr. Justice Rehnquist's opinion in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), in which the Court upheld the *Birnbaum* rule limiting private damages for violations of rule 10b-5, 17 C.F.R. § 240.10b-5 (1975), to purchasers and sellers of securities. Although the context of private antitrust litigation obviously differs from that presented in *Blue Chip Stamps*, the analogy is a fitting one since it indicates that policy considerations frequently shape a court's evaluation of standing arguments. The *Birnbaum* rule had, in fact, been criticized as being "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b-5." *Id.* at 738, 95 S.Ct. at 1926. The Court went on to hold that such a limitation was based on "countervailing" policy considerations. *Id.* at 739, 95 S.Ct. 1917.

of the Clayton Act and involved an action brought by a nonoperating landlord 'of motion picture theatres for treble damages against movie distributors and exhibitors who charged an antitrust conspiracy to restrain trade in the distribution and exhibition of motion pictures throughout the New York metropolitan area. The *Calderone* court acknowledged that "while many remotely situated persons may suffer damages in some degree as the result of an antitrust violation, their damage is usually much more speculative and difficult to prove than that of a competitor who is an immediate victim of the violation." 454 F.2d at 1295.[17] While the court made it clear that a rule of reason approach to standing under Section 4 of the Clayton Act should be used, it went on to observe that "[a] plaintiff not a target of any antitrust violation does not become a target by virtue of the culpability of its lessee, patentee, franchisee, supplier, customer, or debtor." 454 F.2d at 1296.

Under the Court's evaluation of the facts of this case, the injury to plaintiffs Board and Shapiro appears to be both indirect and incidental. While they may consider themselves a "target area," the impact reaches them only as a result of the loss of royalties which, in turn, follows from the business agreement between the licensees (suppliers) and the car manufacturers. In Plaintiffs' Reply Memorandum they state that "[t]he antitrust injury is to plaintiffs' licensing business, not to plaintiffs' patent." Plaintiffs' Reply Memorandum at 25. This is a curious statement, especially in light of the fact that without any initial patent, plaintiffs would not even have any license to grant. Furthermore, the bulk of plaintiffs' complaint as well as their Memorandum opposing defendants' motions for summary judgment address the issue of the serious injury done to the market for innovation and their role as innovators. In light of this relationship between patenting and licensing, a distinction between the two businesses is untenable. Without being li-

censed, a patent will yield no return for the inventor. What plaintiffs seek to prove is that because of their failure to negotiate a profitable licensing agreement, they likewise cannot earn a profitable return on their seat belt retractor patent. The net result, they claim, is injury to the "market for innovation." Yet the injury to plaintiffs' efforts to turn a profit follows from their own unsuccessful licensing negotiations with defendants' suppliers. In one sense, their failure indicates the value which the marketplace establishes for their invention. They did have a monopoly on the patented product and did not have to license it for free. In the event that defendants required plaintiffs' inventions, the automakers could do one of two things: either pay the royalties demanded or invent around the patent and run the risk of a possible patent infringement suit. A finding that plaintiffs lack standing to bring their antitrust claims will have the effect of narrowing this case to a more appropriate focus, namely, the patent infringement count remaining in the original complaint.

■ For these reasons, the standing requirements must be narrowly construed, especially in view of the fact that the patent aspects of this case remove it from the straightforward analysis of standing involved in pure antitrust cases. Also, one cannot overlook the patent aspects of the case and the corresponding rights which Mr. Justice Clarke found to be accorded the patentee:

It has long been settled that the patentee receives nothing from the law which he did not have before, and that the only effect of his patent is to restrain others from manufacturing, using, or selling that which he has invented. The patent law simply protects him in the monopoly of that which he has invented and has described in the claims of his patent. *United States v. American Bell Tel. [Teleph.] Co.*, 167 U.S. 224, 239, 17 S.Ct. 809, 42 L.Ed. 144, 154; *Continental Paper Bag*

---

**17.** The court proceeds to define a target as "a person or business against which competitive aim is taken. The line is clearly drawn by requiring that to have standing one must be an object of an antitrust conspiracy." 454 F.2d at 1296 n. 2.

*Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 424, 28 S.Ct. 748, 52 L.Ed. 1122, 1130; *Bauer & Cie v. O'Donnell,* 229 U.S. 1, 10, 33 S.Ct. 616, 57 L.Ed. 1041, 1043, 50 L.R.A., N.S., 1185, Ann.Cas. 1915A, 150. *Motion Picture Patents Co. v. Universal Film Manufacturing Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917).

The fact that plaintiffs may be concerned about what happens to their invention "down the line" does not mean that whenever they do not like an outcome they can allege an injury. As one commentator has recently observed:

> The holder of a patent has no greater power to restrict the terms upon which a buyer of the patented product resells at the next vertical level than does the owner of any other product. The patentee can obtain the full reward of the patent in the first sale; a right to restrict the goods in more remote channels of trade is not a traditional part of the patent grant nor is it needed in order for the patentee fully to enjoy the monopoly of the patent.

L. A. Sullivan, Antitrust 572 (1978). *See also United States v. Univis Lens Co.,* 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942), where Chief Justice Stone, writing for the Court, said:

> Our decisions have uniformly recognized that the purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article, and that once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold. *Adams v. Burke, supra,* 17 Wall. 453, 456, 21 L.Ed. 700; *Keeler v. Standard Folding Bed Co.,* 157 U.S. 659, 15 S.Ct. 738, 39 L.Ed. 848; *Motion Picture Co. v. Universal Film Co.,* 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A. 1917E, 1187 Ann.Cas. 1918A, 959; and see cases collected in *General [Talking] Pictures Co. v. [Western] Electric Co.,* 305 U.S. 124, 128, n. 1, 59 S.Ct. 116, 118, 83 L.Ed. 81. In construing and applying the patent law so as to give effect to the public policy which limits the granted monopoly strictly to the terms of the statutory grant, *Morton Salt Co. v. [G.S.] Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, the particular form or method by which the monopoly is sought to be extended is immaterial. *The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers.* Whether the licensee sells the patented article in its completed form or sells it before completion for the purpose of enabling the buyer to finish and sell it, he has equally parted with the article, and made it the vehicle for transferring to the buyer ownership of the invention with respect to that article. To that extent he has parted with his patent monopoly in either case, and has received in the purchase price every benefit of that monopoly which the patent law secures to him. *If he were permitted to control the price at which it could be sold by others he would extend his monopoly quite as much in the one case as in the other, and he would extend it beyond the fair meaning of the patent statutes and the construction which has hitherto been given to them.*

316 U.S. at 251–52, 62 S.Ct. at 1094 (Emphasis added). The theory of recovery advanced by plaintiffs would extend the scope of their patent monopoly well into the licensing stage, enabling them to exercise leverage as to the deal eventually concluded between its licensee (supplier) and the automakers, obviously an improper result. The success of such a theory would mean that a patentee could effectively force a form of resale price maintenance scheme upon parties further down the line. Such an effect has been held unlawful in *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). Plaintiffs have already indicated their prior acquiescence in a marketing arrangement in which they voluntarily waived 60% of their royalties. Under plaintiffs' conception of their right to be rewarded for innovation, it would seem that anything less than 100% of the full royalties obtainable would underreward them for their activities.

Plaintiffs' arguments, taken to their logical conclusion, would mean that they were, in all circumstances, entitled to a minimum royalty which was equal to what they felt was the value of their innovation. Anything less would undercompensate them and tend to destroy the "market for innovation." Yet it remains clear that a royalty is only one form of compensation or reward allowed an inventor. While it is recognized that patent licenses are generally granted in exchange for some form of monetary consideration, that remuneration may be fixed or variable, the latter representing a royalty form. *See generally* T. Costner, 14 Business Organizations—Patents § 3.04[1] (1975). It should also be recalled that the actual royalty basis arrived at may be the hardest aspect of concluding a licensing negotiation. *Id.* at § 3.01.[18] A patentee may negotiate for a minimum royalty payment but a court cannot go beyond the agreement of the parties to establish a minimum royalty where the parties themselves fail to provide one. *DeStubner v. United Carbon Co.*, 67 F.Supp. 884 (S.D.W.Va.1946), *aff'd*, 163 F.2d 735 (4th Cir. 1947), *cert. denied*, 334 U.S. 829, 68 S.Ct. 1328, 92 L.Ed. 1757 (1948). Similarly, *United States v. General Electric Co.*, 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362 (1926), held that a bargained-for royalty in licensing agreements does not have to meet a test of reasonableness. It would seem that in a setting in which marketplace economics determine the ultimate value of a new invention, and where that value is determined by negotiations freely entered into between the patentee-owner and the licensee-manufacturer, that a given outcome should not be challenged by the courts, absent, of course, any clearly prohibited anticompetitive behavior. The law has already recognized that a licensor is free to exact from his licensee a price as high as he can get, *Brulotte v. Thys Co.*, 379 U.S. 29, 33, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), and a

corollary of this ruling in a free market setting would be that a licensee should be accorded the right to bargain for as low a price as he can get, up to and including a zero royalty.[19]

Given the facts of licensing, plaintiffs have not been denied compensation altogether—merely variable compensation has been foreclosed to them. The record even shows, by their own admission, that they have already received some $95,000 from American Safety, including a $25,000 down payment prior to the termination of this licensing agreement in 1966 before any of plaintiffs' inventions were marketed. Plaintiffs' Memorandum at 21. The negotiation of a licensing agreement is a difficult and often risky enterprise. Parties entering into such negotiations are not guaranteed any return whatsoever. What is strange is the way plaintiffs characterize these initial negotiations with American Safety in 1963:

> Although plaintiffs were not happy with the prospect of losing a large protion [sic] of the potential royalties on their inventions, *they were compelled*, as a condition of consummating the license agreement with American Safety in 1965, to relinquish their right to 60% of the potential royalties based upon procurement of their inventions by automobile companies, including the defendants.

Plaintiffs' Memorandum at 20 (emphasis added). What do plaintiffs mean when they say they were compelled to give up over half of their royalties? There is no evidence or even innuendo that the result of which plaintiffs complain was anything but the by-product of negotiations freely entered into. Again, the suspicion arises that plaintiffs are upset primarily because they did not receive more money. Receiving $95,000 for an invention which was not even marketed and which was produced by a

---

**18.** Some of the factors to be considered in such negotiations are: the patent's strength, availability of competing technology, the cost to develop the invention, the savings (or profit) to be realized, the cost of the suit, the nature of the license, negotiation costs, the costs of assem-

bling concomitant technical information for the licensee, costs of servicing the agreement, and the licensee's investment. T. Costner, *supra*, at § 3.01.

**19.** *See* comment by J. G. Van Cise, *supra*.

lawyer and a psychiatrist in their spare time is not necessarily a return so insufficient as to deter plaintiffs from ever inventing again.

After the agreement with American Safety was cancelled, plaintiffs conducted licensing negotiations with Hamill a year later, in 1967. Once again they agreed to waive some of their royalties, this time, 50%. By plaintiffs' own admissions, however, and as explained to them by Hamill's attorney, "the burden of paying royalties to plaintiffs and competing with non-royalty-paying suppliers who would benefit from royalty-free licenses under plaintiffs' inventions would be too heavy." Plaintiffs' Memorandum, at 22. One can interpret this remark to mean that plaintiffs' insistence on variable compensation put them at a competitive disadvantage.

## V. CONCLUSION

█ Commenting on the purposes of standing analysis, Berger and Berstein note that it is:

> designed to narrow this broad class of injured persons to a subclass of plaintiffs who are deemed proper parties to sue. The scope of antitrust standing should be determined by reference to the special problems created by treble damage actions, such as ruinous or duplicative recoveries. The scope of substantive protection should be determined in each case by analysis of pertinent *substantive* antitrust policies.

86 Yale L.J. at 836. They recognize that the "distinction between direct and indirect injury is arbitrary, even metaphysical, since all antitrust injuries are 'direct' to a greater or lesser degree." *Id.* at 842–43. The real difficulty with these traditional approaches to standing is their failure to take account of all aspects of antitrust *policy*, including the *in terrorem* effect of treble damages and "overkill" liability, as well as relevant economic and social policies. Such a policy approach to standing analysis must, of necessity, consider the nature and severity of the alleged injury, the parties involved, and the relationship of all of these to substan-

tive antitrust law. Plaintiffs' recovery in this case, if any, must be confined to their claim of patent infringement. Having failed to provide evidence of a conspiracy for purposes of Section 1 of the Sherman Act, they also lack standing by virtue of the fact that the injury alleged is not one which is cognizable under the antitrust laws. Given the protections already afforded plaintiffs by the patent laws, granting them standing would enable them to obtain benefits far beyond those provided by law. By virtue of their patent monopoly, they are free to negotiate whatever price they can obtain for their invention; however, they cannot invoke the antitrust laws to guarantee that such a return, if any, approximates even their minimum expectations.

Thus, in light of the admitted absence of any conspiracy in this case and because plaintiffs as a matter of law lack standing to sue as to counts one and two, defendants' motions for partial summary judgment as to these counts shall be granted. The Court expresses no opinion on the claim by defendants that laches or the statute of limitations bars plaintiffs' action.

Accordingly, it is this 29th day of May, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. That defendants' motions for partial summary judgment be, and the same are hereby GRANTED; and

2. That plaintiffs' motion for partial summary judgment be, and the same is, hereby DENIED.