John E. MULHEARN Sr., d/b/a Mul-
hearn Funeral Home of Shreveport

v.

ROSE-NEATH FUNERAL HOME,
INC., et al.

Civ. A. No. 78–0606.

United States District Court,
W. D. Louisiana,
Shreveport Division.

April 2, 1981.

John E. Mulhearn Sr., pro se.

Billy R. Pesnell and David L. Smelley, Hargrove, Guyton, Ramey & Barlow, Shreveport, La., Frank S. Normann, Normann & Normann, New Orleans, La., and Donald T. Carmouche, Donaldsonville, La., for defendants Security Industrial Insurance Co., Wellman's Funeral Home, Inc., Charles Boone, d/b/a Boone Funeral Home, Inc., and E. J. Ourso.

Lawrence K. Benson and Katherine Goldman, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., and Ben E. Coleman, Skeels, Baker & Coleman, Shreveport, La., for defendants Kilpatrick Life Insurance Co. of Louisiana, Rose-Neath Funeral Home, Inc., and Virginia Shehee.

Charles S. Weems III, Gold, Little, Simon, Weems & Bruser, Alexandria, La., for defendant Fireside Commercial Life Insurance Co.

## MEMORANDUM RULING

STAGG, District Judge.

Plaintiff filed this action on May 17, 1978, contending that the activities of several insurance companies and funeral homes vio-

lated the antitrust laws, and that the anti-competitive effect of those violations forced his own funeral home out of business. The funeral homes named as defendants are Rose-Neath Funeral Homes, Inc. (Rose-Neath) and Wellman Funeral Parlor, Inc. (Wellman). The insurance company defendants are Kilpatrick Life Insurance Company (Kilpatrick), Security Industrial Insurance Company (Security) and Fireside Commercial Life Insurance Company (Fireside).[1] Finally, named as individual defendants are Virginia K. Shehee (Shehee), Charles S. Boone (C. S. Boone) and E. J. Ourso (Ourso), each of whom has been named only in his or her capacity as an executive officer with a funeral home and/or an insurer.

Plaintiff's original complaint was a vague and conclusory document, and all defendants eventually filed motions to strike, motions for a more definite statement, or motions to dismiss various portions of the complaint. At a hearing held April 11, 1980, this court granted most of the motions and ordered plaintiff to file an amended complaint setting out specifically his contentions regarding defendants' alleged violations of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, and the Clayton Act, 15 U.S.C. §§ 12, *et seq.*

On May 8, 1980, plaintiff submitted his first amended complaint, but that complaint did not comply with the court's ruling of April 11, 1980 since it contained certain allegations that the court had ordered stricken, and generally failed to clarify the nature of plaintiff's allegations concerning *how* defendants allegedly violated the antitrust laws. After an informal status conference, the court ordered plaintiff to submit a second amended complaint, in complete conformance with the court's April 11 ruling. · Plaintiff filed this document on May 27, 1980, but it also did not comply with the court's ruling. In the interest of proceeding with this rapidly aging case, the defendants apparently avoided fil-

ing further objections to the second amended complaint, choosing instead to depose plaintiff to discover the nature of his allegations. This deposition took place on July 17–18, 1980.

During the deposition, plaintiff's allegations became more clear. Each defendant insurance company issues "funeral service insurance". The primary benefit of this insurance is a funeral service, and each policy states a face value for this service. In addition, an "official" or "authorized" funeral director is designated in each policy to provide the funeral service. Each policy provides that if an insured's family chooses not to avail themselves of the services of the authorized funeral director, the family receives an alternative cash payment of at least 75 per cent of the policy's face value.

All of the defendant insurance companies agreed with one or more funeral homes to serve as "authorized" funeral director for their policies. Rose-Neath was the authorized funeral director for Kilpatrick, Wellman and Boone Funeral Home, Inc. (Boone) for Security, and Osborn's Funeral Home, Inc. (Osborn's) for Fireside.

The linchpin of plaintiff's claims is that the 75 per cent alternative cash payment provisions in the funeral service insurance policies "coerce" the families of policy holders to accept funeral services at the named funeral homes in order to get the most value for their money. Plaintiff refers to the working agreements between the insurers and the funeral homes as "tying agreements", which allegedly have an anticompetitive effect on unauthorized funeral homes, such as plaintiff's, due to the "coercive" 75 per cent cash payment provisions. Plaintiff further argues that the defendants have engaged in illegal "price fixing", because the prices of funeral services provided to policy holders are fixed as of the date the policies are issued. Finally, plaintiff argues that Rose-Neath's purchases of the First National Funeral Home of Shreveport and of other funeral homes in

---

1. Commonwealth Life Insurance Company was dismissed from this action on February 9, 1981, after reaching a settlement with plaintiff.

Logansport, Minden and Coushatta constitute illegal acquisitions under § 7 of the Clayton Act.

In the pretrial order, plaintiff added one further contention which was not clearly discernible from his deposition. Plaintiff argues that the fact that defendant insurance companies sell funeral service policies only in areas where authorized funeral directors are located constitutes a territorial allocation, in violation of § 1 of the Sherman Act.

On January 30, 1981, defendants jointly moved for summary judgment. For the reasons set out hereinafter, the court agrees with defendants that plaintiff's allegations are insufficient as a matter of law. The court will treat each of plaintiff's contentions separately.

### (1) THE 75 PER CENT CASH PAYMENT PROVISIONS

■ During plaintiff's deposition, plaintiff admitted that the "whole group of contractual arrangements" between policy holders and insurers and between insurers and authorized funeral directors "becomes illegal only when the insurance company in its contract with the policy holder agrees to provide less than the numerical face amount of the policy unless the funeral service, which is the primary benefit, is provided at an authorized funeral home".[2] There is no question that plaintiff's claims are barred by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–13, inasmuch as they are solely concerned with provisions contained in an insurance policy. Section 2(b) of the Act, 15 U.S.C. § 1012(b), exempts from the coverage of the antitrust laws any agreements which constitute the "business of insurance" and are regulated by state law. In this case, the 75 per cent cash payment provisions are specifically regulated by Louisiana law. La.R.S. 22:253. Moreover, the Louisiana Legislature has expressed its intention to regulate the insurance business "in all its phases". *Id.* § 2A.

In addition, as defendants noted in their memorandum, the Supreme Court has held

---

**2.** Mulhearn deposition, July 18, 1980, at 395. The full text of the pertinent exchange is as follows:

Q Is it a violation of the antitrust laws to presell a funeral?
A I would not think so.
Q Is it a violation of the antitrust laws to presell a funeral at a particular funeral home?
A I would think not.
Q Do you contend it's a violation of the antitrust laws for an insurance company to sell a policy that provides as a death benefit a funeral at a particular funeral home?
A I would think not.
Q Do you contend it's a violation of the antitrust laws for a funeral home to have more than one location?
A No, sir.
Q Do you contend it's against the antitrust laws for an insurance company who has sold such a contract to make a contract with a funeral home to insure that the service that's called for is provided?
A If it has a provider clause that's coercive in it, I do.
Q I'll get to your contentions on that. Just answer the question I asked.
A If you will repeat that.
Q Do you contend it's a violation of the antitrust laws for an insurance company, having sold a funeral benefit policy, to make a contract with a funeral home to provide the death benefit?
A No, sir. Let me add something to the answer that I just gave you.
Q I'll give you a chance to do that in just a minute. Like Mr. Newell, I'm trying to say where we differ.
A I know, but I need without more on the end of that answer.
Q Is there anything illegal when such a contract is made about the funeral home and the insurance company agreeing on the compensation that the insurance company is going to pay that funeral home for performing the service?
A Without more, no.
Q Now, do I understand you correctly, then, that *your contention is that this whole group of contractual arrangements becomes illegal or any one of them becomes illegal only when the insurance company in its contract with a policyholder agrees to provide less than the numerical face amount of the policy unless the funeral service, which is the primary benefit, is provided at an authorized funeral home?*
A *True.*
Q *That's where it becomes illegal?*
A *Right.*

Mulhearn deposition at 393–95 (emphasis added). *See also* Mulhearn deposition at 383, quoted in footnote 5, *infra.*

that the "business of insurance" "relates to the contract between the insurer and the insured. . . . '[W]hatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policy holder.'" *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 1075, 59 L.Ed.2d 261 (1979) (citation omitted). Undoubtedly, the 75 per cent cash payment provisions not only "relate" to the contracts between the insurance companies and the policyholders, but are an integral part of those contracts. Thus, plaintiff's claims concerning the al-legedly "coercive" and anticompetitive nature of the 75 per cent cash payment provisions are barred by the McCarran-Ferguson Act.

### (2) "PARALLEL CONSENSUAL ACTIVITIES"

Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies in restraint of trade. Plaintiff does not contend that defendants have entered into any express agreement, oral or written, to restrain trade by forcing out competitors.[3] However, plaintiff argues that defendants'

3. Q  Do you claim that any of the defendant insurance companies had any agreement, verbal or written, with any of the insurance companies named as a co-conspirator in Paragraph 11 [of plaintiff's second amended complaint] in restraint of trade?
A  Only in that the parallel action and the tacit agreement between them to follow the same pattern.

\*     \*     \*     \*     \*     \*

Q  []  Do you claim that any of the insurance companies named as a defendant in your complaint had any kind of agreement, verbal or written, with any of the insurance companies named as a co-conspirator in Paragraph 11 of your complaint in restraint of trade?
A  I would say they—these are just insurance companies you're talking about, co-conspirator insurance companies?
Q  Yes.  I'm limiting it to the co-conspirator insurance companies, the insurance companies named as a co-conspirators, not the funeral homes.
A  The only tacit agreement is that they follow the same pattern.
Q  You claim only that their actions were parallel and consensual?
A  Right.
Q  . . . not that there was any express—
A  . . . or written.
Q  —agreement in constraint of trade?
A  Right.
Q  Now, let me go back and direct your attention to the funeral homes that are named as defendants in your complaint.  Do you contend that Wellman's Funeral Home, Inc., or Boone's Funeral Home had any kind of agreement, verbal or written, with Rose-Neath Funeral Home in restraint of trade?
A  No, other than the tacit—the arrangement which is parallel with the funeral home as far as with the insurance companies.
Q  Your claim is only that they have engaged in parallel conduct?

A  Right, parallel.  It's consensual.  Parallel action is consensual.
Q  What do you mean, "consensual"?
A  With the knowledge of what the other one is doing.
Q  In other words, you claim—
A  It amounts to a tacit agreement that we'll all operate in this manner.
Q  Well, now, do you claim that there was such an agreement, in fact, whether it's verbal or nonverbal, between Wellman's Funeral Home and Boone's Funeral Home, on the one hand, and Rose-Neath on the other?
A  The same as I did about the insurance companies, true.
Q  You do not claim that there was any agreement—
A  Any written agreement or oral agreement, but that there was a tacit agreement and that they operated in parallel action consensually.
Q  What do you mean by the use of the term "tacit agreement"?
A  You can have an agreement by actions as well as by written or verbal word.

\*     \*     \*     \*     \*     \*

Q  Do you claim that there is any agreement between Wellman's Funeral Home and Rose-Neath Funeral Home that they will operate their businesses in the same way?
A  Insofar as the designated and authorized funeral home in connection with its affiliated insurance companies, I say they do.
Q  That they've got an agreement; in other words, they have agreed with each other that they are going to do business just as they are doing?
A  *Only by their actions.*
Q  *You infer that only because they do, in fact, do business in the same way?*
A  *Right.  That's true.*
Mulhearn deposition, July 17, 1980 at 180–84 (emphasis added).

"parallel consensual activities" constitute a "tacit agreement" to restrain trade.[4]

During plaintiff's deposition, it became clear that plaintiff's allegation of illegal "parallel consensual activity" is exempt from scrutiny under the McCarran-Ferguson Act. At pp. 188 and 189 of the deposition, the following exchange took place:

Q (BY MR. PESNELL) Now, Mr. Mulhearn, you allege in Paragraph 7 of your complaint on Page 6 in the last full paragraph that the defendant insurance companies and their associated, affiliated and subsidiary funeral homes have been parallel and consensual in their actions. And that allegation is repeated in other portions of your complaint. In what respect has the actions or the conduct of Security Industrial Insurance Company been parallel to the actions of Kilpatrick Insurance Company and the other insurance companies named as a defendant in your complaint?

A They've been parallel and consensual in the respect of how the burial insurance system in Louisiana works and has worked; *and that is the defendant insurance company authorizes a particular or designated funeral home to service the policy of the policyholder. And if an unauthorized funeral home services a policy, the payment to the unauthorized funeral home is less than the payment to the authorized funeral home.*

(Emphasis added.) This passage clearly reflects that the "parallel consensual activities" of which plaintiff complains are founded upon the insurance company defendants' use of the 75 per cent cash payment provisions in their funeral service insurance policies. As discussed above, these provisions are inherently a part of the "business of insurance", so that plaintiff's claim of a "tacit agreement" in restraint of trade is barred by the McCarran-Ferguson Act.

■ In addition, it is arguable that the issue of "parallel consensual activities" is foreclosed by plaintiff's admission during his deposition that defendants in fact have never agreed or conspired to restrain trade. In *Theater Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1965), the Supreme Court discussed allegations of "conscious parallelism" as follows:

The crucial question is whether respondent's conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement.... *But this court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense.* Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but, *"conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely....*

(Emphasis added.) In *Shapiro v. General Motors Corp.*, 472 F.Supp. 636 (D.Md.1979), plaintiffs brought an antitrust action against General Motors and Ford. After the defendants moved for summary judgment, the court held a hearing at which plaintiffs admitted that they had no proof of conspiracy. The court noted that "the true nature of plaintiff's substantive antitrust argument is not the existence of a

---

4. *See* footnote 3, *supra.* Plaintiff further explained his contention regarding a "tacit agreement" as follows:

Q What you had told me, then, if I understand you correctly, is simply that their business actions in the respects that you have mentioned are simply parallel? That's all you have said?
A All I've said. And each one knows that the other does it.

*Q That's all you really mean to say by the term "tacit agreement", isn't it? In other words, each one of them does it and all of them know that the other one is doing it?
A That's true.*
Mulhearn deposition, July 17, 1980 at 186 (emphasis added).

conspiracy but the presence of consciously parallel behavior.... Conscious parallelism, also known as the 'interdependence theory' of oligopoly pricing, refers to the situation alleged to result in markets where there are a few sellers and where, though lacking an express agreement, the sellers appear to establish their prices in a 'consciously parallel' fashion." 472 F.Supp. at 647 (citation omitted). Based upon the plaintiffs' admission that they had no proof of conspiracy, and in consideration of the above-cited language from *Theater Enterprises, Inc.*, the court rejected plaintiffs' contention that the allegedly consciously parallel behavior fulfilled the requirement of the Sherman Act that a conspiracy be proven.

Similarly, in this case, plaintiff has never alleged that defendants actually conspired to restrain trade. Rather, he admitted that his allegation of "parallel consensual activities" is based solely on the fact that the defendants actually operate their businesses as they do. Accordingly, as in *Shapiro*, the doctrine of conscious parallelism, insofar as it constitutes circumstantial proof of conspiratorial actions, is of no aid to plaintiff.

Thus, plaintiff's inability to prove that defendants conspired or agreed to restrain trade, whether through operation of the McCarran-Ferguson Act or because of the insufficiency of his allegation of conscious parallelism, renders his claims under § 1 of the Sherman Act insufficient as a matter of law.

### (3) THE ALLEGED TYING AGREEMENTS

■ On page 25 of the pretrial order in this case, plaintiff alleges "that a tying agreement" in violation of § 1 of the Sherman Act "results from the issuance of a funeral service policy which designates an official funeral director and provides for an alternative cash benefit of less than 100 per cent of the face value of the policy if the official funeral director is not used." As discussed above, plaintiff's claims under § 1 of the Sherman Act are insufficient due to his inability to establish that defendants conspired or agreed to restrain trade. In addition, plaintiff's contentions regarding tying agreements, couched as they are within the context of the *issuance* of funeral service policies, are clearly exempt from antitrust scrutiny under the McCarran-Ferguson Act.[5]

### (4) THE ALLEGED PRICE FIXING

■ Plaintiff also contends, on page 25 of the pretrial order, that "price fixing, in violation of § 1 of the Sherman Act, occurs at the time of issuance of a burial policy because the amount which will be paid to the funeral director is fixed in the policy." Again, plaintiff's inability to establish that defendants conspired or agreed to restrain trade scuttles this § 1 claim. Moreover, as with plaintiff's allegations of tying agreements, his contentions regarding price fixing are exempt from antitrust scrutiny under the McCarran-Ferguson Act. The gist of plaintiff's price fixing allegation is that the amount which will be paid to the funeral director is fixed by the face value of the policy. The contention that this fact is in violation of the antitrust laws is ludicrous. As the court noted in *Knuth v. Erie-Crawford Dairy Cooperative Association*, 326

---

**5.** Moreover, it appears from plaintiff's testimony at his deposition that his complaints concerning "tying agreements" relate to the 75 per cent alternative cash payment provisions:

> Q Mr. Mulhearn, just one thing I want to make sure I understand. If there had been no so-called tying agreement, as you categorize it—and let me make it clear that I don't agree there is any tying arrangement—there would not have been any illegal conduct, in your opinion; is that right? If there had been no tie with an authorized funeral home—

> A *If the provider clause had been out, if there had been no provider clause and there had been no decrease in the value of payment for unauthorized funeral homes*; in other words, as it is—

> Q I understand the way it is. I think you can go ahead and finish your statement. *If there had been no decrease in the payment of benefits to an unauthorized home, then there would be no illegal conduct; is that right?*

> A *Right.*

Mulhearn deposition, July 18, 1980 at 383 (emphasis added).

F.Supp. 48, 53 (W.D.Pa.1971), *modified on other grounds*, 463 F.2d 470 (3d Cir. 1972), *cert. denied*, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973), "to agree upon a price with a customer in the absence of other circumstances is not within the legal prohibition. Decisional law has established that 'price fixing' within the intent of the Sherman Act is either horizontal (dealing with arrangements among competitors) or vertical (attempting to control the resale price)." (Footnotes omitted.) In this case, the policy holder and the insurance company "agree" upon a price for a funeral service at the time the policy holder takes out an insurance policy of a stated face value. Obviously, there is no horizontal price fixing present in this case, since there are no "arrangements" among competitors, inasmuch as the insurance companies and the funeral homes who are designated in the policies are not competitors. In addition, there is no vertical price fixing since no "resale price" is involved. Accordingly, the court finds that plaintiff's allegations of price fixing are meritless.

### (5) THE ALLEGED TERRITORIAL ALLOCATION

Plaintiff's final allegation under § 1 of the Sherman Act is "that a territorial allocation . . . occurs by virtue of the fact that defendant insurance companies sell only in areas where there are located official funeral directors as providers." Pretrial order at 25, paragraph 5. Within the context of this action, this allegation is inexplicable. An insurance company that issues funeral service policies assures that it will be able to furnish those services by contracting with a funeral home. To say that any of the defendant insurance companies sells only in an area where a provider funeral home is located puts the cart before the horse. Presumably, if no funeral homes were located in this area to serve as providers, it would be most difficult for an insurance company to assure that holders of burial service insurance policies would be able to receive those services; therefore, it is likely that few funeral service policies would be issued.

In addition, though the court is unsure of the exact meaning of plaintiff's contention as stated on page 25 of the pretrial order, the court finds that this claim, as stated, is barred by the McCarran-Ferguson Act. As mentioned above, plaintiff complains that a territorial allocation "occurs" because defendant insurance companies *sell* only in areas where authorized funeral directors are located. There can be no question that sales of insurance policies constitute the "business of insurance" within the contemplation of the McCarran-Ferguson Act. For these reasons, the court finds that plaintiff's contentions regarding an alleged territorial allocation are specious.

### (6) PLAINTIFF'S CLAIMS UNDER § 2 OF THE SHERMAN ACT

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . .

On page 25 of the pretrial order, in paragraph 3, plaintiff sets forth his claim under § 2 as follows:

> Plaintiff contends that monopolization of, or an attempt to monopolize, the market in furnishing funeral service and selling funeral supplies and merchandise, in violation of § 2 of the Sherman Act, results from the issuance of a funeral service policy which designates an official funeral director and provides for an alternative cash benefit of less than 100 per cent of the face value of the policy if the official funeral director is not used.

Like most of the claims discussed above, this claim is barred by the McCarran-Ferguson Act because it relies upon the existence of the alternative cash payment provisions in the funeral service insurance policies. This court has already found that these provisions are an integral part of the policies and are therefore within the pur-

view of the "business of insurance" as that term is used in § 2(b) of the McCarran-Ferguson Act.

### (7) THE ALLEGEDLY ILLEGAL ACQUISITIONS

■ Plaintiff's final allegation is that Rose-Neath's purchases of the First National Funeral Home of Shreveport and of funeral homes in Logansport, Minden and Coushatta constitute illegal acquisitions under § 7 of the Clayton Act. As defendants noted in their pretrial memorandum of law, the only factual allegation concerning this claim is contained in paragraph I(A)(17) of the pretrial order, which reads as follows:

> Plaintiff contends that Rose-Neath Funeral Home, Inc. in 1973 acquired First National Funeral Home of Shreveport, Louisiana, from Commonwealth Life Insurance Company of Kentucky and thereafter closed it.

The court agrees with defendants' argument that plaintiff's claim regarding the alleged acquisition in 1973 has expired by operation of the statute of limitations. 15 U.S.C. § 15b establishes a four-year limitation period on an antitrust claim brought under § 7 of the Clayton Act. As mentioned previously, this action was not filed until May 17, 1978, more than four years after any acquisition which could have taken place in 1973. As defendants have observed, the four-year period of limitations for damages under § 7 of the Clayton Act begins to run from the date of the alleged acquisition. *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 491 F.Supp. 1199, 1224 (D.Haw.1980). Thus, this court finds that plaintiff's claim under § 7 of the Clayton Act is barred by the statute of limitations insofar as it concerns the alleged acquisition by Rose-Neath of the First National Funeral Home of Shreveport.

■ Concerning the alleged acquisitions of funeral homes in Logansport, Minden and Coushatta, the court agrees with defendants that plaintiff has no standing to challenge any alleged acquisitions in those locations. Plaintiff simply did not attempt to enter business in those locations. *See Martin v. Phillips Petroleum Company*, 365 F.2d 629, 633 (5th Cir. 1966). Plaintiff evidently contends that Logansport, Minden and Coushatta are within the relevant geographical area at issue in this case. Even assuming for the sake of argument that plaintiff is correct, any anticompetitive effect *upon plaintiff* resulting from the alleged acquisitions in Logansport, Minden and Coushatta would certainly be *de minimis*. For these reasons, the court finds that plaintiff's claims under § 7 of the Clayton Act are meritless.

### (8) THE *BATTLE* CASE

Throughout the course of this lawsuit, and particularly in his pretrial memorandum of law, plaintiff has relied heavily upon the Fifth Circuit's opinion in a similar antitrust case, *Battle v. Liberty National Life Insurance Co.*, 493 F.2d 39 (5th Cir. 1974). In *Battle*, the Fifth Circuit reversed the ruling of a district court which had granted defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6). Despite the superficial similarities between *Battle* and this case, a cursory review of the *Battle* opinion reveals that it is totally distinguishable from this case.

To begin with, the Fifth Circuit's reversal of the district court was based upon the principles of review concerning the granting of a Rule 12(b)(6) motion. The Fifth Circuit characterized the scope of this appellate review as "narrow". 493 F.2d at 44. Basically, the Fifth Circuit considered only the sufficiency of the allegations contained in plaintiffs' complaint.

Unlike the district court in *Battle*, this court is not dismissing plaintiff's claims pursuant to Rule 12(b)(6). Rather, the court has considered the entirety of plaintiff's deposition, as well as the stipulations of fact and the issue of fact and law that are contained in the pretrial order, in ruling upon defendants' motion for summary judgment.[6] As discussed above, these sources of

---

6. Neither in his brief in opposition to the motion for summary judgment nor in his pretrial memorandum of law has plaintiff quarreled with any of the factual information this court has relied upon in preparing this Ruling.

information indicate affirmatively that plaintiff's claims, for the most part, are barred by the McCarran-Ferguson Act since they are based upon provisions contained in insurance policies.

A second major distinction between *Battle* and this case is that, in *Battle*, the McCarran-Ferguson Act was not applicable since plaintiffs were attacking the legality of the provider agreements between the insurance company and the funeral homes, rather than alternative cash payment *provisions* in the insurance policies. To some extent, the Fifth Circuit's ruling on this issue anticipated the Supreme Court's holding in *Group Life & Health Insurance Co., supra*, that collateral agreements between insurance companies and third parties do not constitute the "business of insurance" within the contemplation of the McCarran-Ferguson Act. In this case, however, plaintiff has directed his claims at specific provisions contained in insurance policies.

Finally, the factual circumstances in *Battle* were quite different from those presented in this case. Liberty National Life Insurance Company (Liberty National) and its wholly-owned subsidiary, Brown-Service Funeral Homes Company, Inc. (Brown-Service), had a contractual relationship by which Brown-Service agreed to furnish the commodities and services required by Liberty National's burial insurance policies. To perform its obligations under that contract, Brown-Service in turn contracted with many independent funeral homes. Upon signing a contract with Brown-Service, each funeral home became an "authorized" funeral home for servicing Liberty National's burial insurance policies. Plaintiffs alleged that 192 of a total of 224 funeral homes in the State of Alabama had contractual relationships with Brown-Service.

This factual situation contrasts sharply with the instant case, where three separate insurance companies have contractual relationships with four separate funeral homes. The overwhelming market power of Liberty National and Brown-Service is not alleged and does not exist. More importantly, Liberty National and its subsidiary allegedly operated as a contractually-tied juggernaut in crushing competition, while in this case plaintiff does not allege that the independent insurance companies have contracted or operate as one.

For these reasons, the court concludes that *Battle* is inapposite. Not only are its legal principles inapplicable, but its factual situation is distinguishable. Plaintiff's heavy reliance upon *Battle* is misplaced.

## CONCLUSION

The Supreme Court ruled in *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), that "summary procedures should be used sparingly in complex antitrust litigation...." 368 U.S. at 473, 82 S.Ct. at 491. However, at least one subsequent Supreme Court decision apparently concurs with Justice Harlan's dissenting opinion in *Poller* that Fed. R.Civ.P. 56 should be given its "full legitimate sweep" in antitrust cases due to "the special temptations that the statutory private antitrust remedy affords for the institution of vexatious litigation, and the inordinate amount of time that such cases sometimes demand of the trial court." 368 U.S. at 478, 82 S.Ct. at 493 (Harlan, J., dissenting). In *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court distinguished *Poller* and held that Rule 56 does not allow plaintiff's antitrust claims to be submitted to the factfinder "on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations ...." 391 U.S. at 290, 88 S.Ct. at 1593. The court further noted:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring

that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*Id.*

Other courts granted summary judgment in antitrust cases where the facts adduced through discovery and stipulation revealed the specious nature of the claims. *See, e. g., Universal Lite v. Northwest Industries,* 452 F.Supp. 1206 (D.Md.1978), *modified on other grounds,* 602 F.2d 1173 (4th Cir. 1979), citing *First National, supra; Shapiro v. General Motors Corp., supra.* In this case, plaintiff's own testimony given at his deposition, the stipulations contained in the pretrial order, and plaintiff's contentions as enunciated both during his deposition and in the pretrial order, reveal that plaintiff's claims are insufficient as a matter of law. As the pretrial order clearly discloses, there are many questions of fact which have not been resolved. However, none of those issues of fact are material to a resolution of the legal issues addressed in this Ruling. Accordingly, defendants' motion for summary judgment is GRANTED, and plaintiff's claims are DISMISSED.